STATE of Delaware, Plaintiff,

v.

Herbert Lee SPENCE, Defendant.

Roy Luther RICHARDSON, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Franklin C. FORAKER, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Linwood Lee SHIELDS, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Alan B. CARPENTER, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Clarence HOOKS, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Sterling HOBBS, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Wilbur JOHNSON, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Robert GOLSON, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Regent J. GODDARD, Defendant below, Appellant,

v.

STATE of Delaware, Plaintiff below, Appellee.

Supreme Court of Delaware.

Submitted Sept. 9, 1976.

Decided Oct. 22, 1976.

Richard R. Wier, Jr., Atty. Gen., and Charles M. Oberly, III, State Prosecutor, Wilmington, for the State in all cases.

Arlen B. Mekler, Asst. Public Defender, Wilmington, for defendants Herbert Lee Spence, Roy Luther Richardson, Alan B. Carpenter, Clarence Hooks, Sterling Hobbs, Robert Golson and Regent J. Goddard.

Jerome O. Herlihy and Stephen P. Casarino, Wilmington, for defendant Franklin C. Foraker.

George F. Gardner, III and I. Barry Guerke, of Schmittinger & Rodriguez, Dover, and James A. Fuqua, Jr., of Ennis & Fuqua, Georgetown, for defendant Linwood Lee Shields.

Before HERRMANN, C. J., DUFFY, and McNEILLY, JJ.

HERRMANN, Chief Justice:

This certification presents the question of the constitutionality of capital punishment for first degree murder under 11 Del.C. §§ 636 and 4209.[1] in light of the recent decisions of the United States Supreme Court in *Woodson v. North Caroli-*

I. 11 Del.C. § 636 provides:
"§ 636. Murder in the first degree; class A felony.
"(a) A person is guilty of murder in the first degree when:
"(1) He intentionally causes the death of another person;
"(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person;
"(3) He intentionally causes another person to commit suicide by force or duress;
"(4) He recklessly causes the death of a law enforcement officer, corrections employee or fireman while such officer is in the lawful performance of his duties;
"(5) He causes the death of another person by the use of or detonation of any bomb or similar destructive device;.
"(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom;
"(7) He causes the death of another person in order to avoid or prevent the lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction.
"(b) Murder in the first degree is a class A felony and shall be punished as provided in § 4209 of this title."
11 Del.C. § 4209 provides:
"§ 4209. Method and punishment for first degree murder.
"(a) In any case in which a person is convicted of first degree murder the court shall impose a sentence of death. If the penalty of death is determined to be unconstitutional the penalty for first degree murder shall be life imprisonment without benefit of parole.
"(b) The imposition of a sentence of death shall be upon such terms and conditions as the court may impose in its sentence, including the place, the number of witnesses and conditions of privacy. Punishment of death shall, in all cases, be inflicted by hanging by the neck, and the carrying out of such sentence may not be less than 10 days after the imposition of the sentence. The court or the Governor may suspend the execution of the sentence until a later date to be specified, solely to permit completion of the process of. judicial review of said conviction."

*na,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976) and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

I.

For the presentation and determination of that question, there have been consolidated in these proceedings the 9 cases now pending in this Court in which death sentences have been imposed under § 4209.[2]

As accepted, this certification from the Superior Court presents the following questions of law:

"1. Are the provisions governing punishment for first degree murder in 11 Del.C. § 4209(a) constitutional under *Woodson v. North Carolina* and related cases? *

[* Including the questions of the constitutionality of both sentences of § 4209(a) and the separability thereof.]

"2. If the answer to question 1 is no, what sentence may be imposed?

"3. If the answer to question 2 is 'life imprisonment without benefit of parole', what does that sentence mean in light of 11 Del.C. § 4371, *et seq.?*"

II.

Prior to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Delaware had a First Degree Murder Statute (11 Del.C. § 571)[3] defining that of-fense and prescribing death as the penalty upon conviction, and a Mercy Statute (11 Del.C. § 3901)[4] providing for life imprisonment instead of the death penalty if the jury recommended mercy and the Trial Judge concurred.

In *State v. Dickerson,* Del.Supr., 298 A.2d 761 (1972), this Court attempted to test those Statutes against the ten separate opinions which constituted the 5–4 decision of the United States Supreme Court in *Furman.* The precise holding of the Court in that case was not easy of ascertainment. As we stated in *Dickerson:*

"The threshold problem is an accurate understanding of the precise holding of the *Furman* case which has become the law of the land binding upon this Court. This presents some difficulty, in view of the fact that each of the nine justices wrote a separate opinion setting forth a different rationale, while a tenth *per curiam* opinion represents the decision of the Court in its 5–4 decision. Dissenting members of the Court, themselves, expressed doubt as to the precise scope and meaning of the majority decision in *Furman.*" (298 A.2d at 762)

In our attempt to interpret the multi-opinioned *Furman* decision, we concluded in *Dickerson* that: (1) "the effect of *Furman* is to invalidate the uncontrolled discretionary imposition of the death penalty by jury or judge"; (2) the Delaware Mercy Statute failed to meet that test and was unconstitutional; but (3) the First Degree Murder Statute was severable and, stand-

---

2. In addition thereto, there are three first degree murder cases now pending in the Superior Court in which the imposition of the death sentence under § 4209 is being withheld pending this decision; and there are at least 13 charges of murder in the first degree presently awaiting indictment or trial in the Superior Court.

3. 11 Del.C. § 571 then provided:
"§ 571. Murder in the first degree.
"Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping, or treason, is guilty of murder in the first degree and of a felony, and shall suffer death."

4. 11 Del.C. § 3901 provided:
"§ 3901. Recommendation of mercy.
"In all cases where the penalty for crimes prescribed by the laws of this State is death, if the jury, at the time of rendering their verdict, recommends the defendant to the mercy of the Court, the Court may, if it seems proper to do so, impose the sentence of life imprisonment instead of death."

ing alone, prescribed a permissible mandatory death penalty under *Furman*. We reasoned in *Dickerson* that *Furman* would be met by a withdrawal of all sentencing discretion from juries and judges in capital cases, and we concluded:

> "As has been demonstrated, *Furman* does not hold that mandatory capital punishment *per se*, uniformly applied, is violative of the Eighth Amendment. The express reservations of Justices Stewart and White and the analyses contained in the dissenting opinions make that clear. Accordingly, we are satisfied that the mandatory death penalty of the Murder Statute, if uniformly applied, has not been invalidated by *Furman*."[5] (298 A.2d at 767)

In a continuing post-*Furman* effort to comply with its understanding of that decision, the Delaware General Assembly, like the Legislatures of at least nine other States,[6] sought to re-enact the death penalty as a constitutionally valid punishment by re-defining the crime of first degree murder (the present § 636) and by making death the mandatory punishment for those found guilty of that crime (the present § 4209).[7]

In *State v. Sheppard*, Del.Supr., 331 A. 2d 142 (1974), this Court examined the present §§ 636 and 4209 and, adhering to the *Dickerson* rationale, held § 4209 valid under *Furman*.

Since the enactment of the present § 4209 in 1974, death sentences have been imposed thereunder upon the 9 appellants in these appeals.

### III.

Now, in *Woodson v. North Carolina, supra*, and *Roberts v. Louisiana, supra*, a plurality of three members of the United States Supreme Court (Stewart, Powell, and Stevens, JJ.) give belated enlightenment as to the meaning and effect of *Furman*; two members (Brennan and Marshall, JJ.) adhere to their views in *Furman* that the death penalty *per se* is cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments; and four members of the Court dissent with some vigor as to the meaning and effect given *Furman* by the plurality.

Therefore, in our search for the current state of the law on the question now before this Court, we must look to the opinions of the plurality in the North Carolina and Louisiana cases for direction.[8]

---

5. The Supreme Court of North Carolina cited *Dickerson* with approval for that proposition in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973).

6. It appears that 10 States, in their post-*Furman* attempts to interpret and comply with the Eighth Amendment, enacted Statutes providing for mandatory capital punishment all of which enactments, it has been said, "the plurality seeks to explain as due to a wrong-headed reading of the holding in *Furman*." See *Woodson v. North Carolina*, 428 U.S. at 313, 96 S.Ct. at 2995-96 (Rehnquist, J. dissenting).

7. An interim legislative effort in this field was the prior 11 Del.C. § 4209 (58 Del.L. Ch. 284, effective July 1973, repealed and replaced in March 1974 by the present § 4209) which provided for a bifurcated hearing before jury or judge, including mitigating circumstances and the imposition of sentence of life imprisonment or death at the discretion of judge or jury upon conviction of first

degree murder. In *State v. Smith*, Del.Supr., 324 A.2d 203, 206 (1974), this Court held that effort unconstitutional because "[t]hat statute, like its predecessor (the Mercy Statute) gave a jury uncontrolled discretionary disposition of the death penalty and the effect of *Furman* is to invalidate it."

8. The North Carolina Death Penalty Statute [N.C.Gen.Stat. § 14-17 (Cum.Supp., 1975)] provided as follows:

> "*Murder in the first and second degree defined; punishment.*—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprison-

In the *North Carolina* and *Louisiana* decisions, the plurality struck down the mandatory death statutes there involved upon the following three grounds:

First, the plurality stated that the "Eighth Amendment draws much of its meaning from 'the evolving standards of decency that mark the progress of a maturing society'"; that one of the "most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense." From those premises, the plurality concluded that a mandatory death penalty for first degree murder "departs markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement that the State's power to punish 'be exercised within the limits of civilized standards.'" *Woodson*

*v. North Carolina,* 428 U.S. at 301, 96 S. Ct. at 2990. Moreover, the plurality expressed the belief that the "history of mandatory death penalty statutes indicates a firm societal view that limiting the scope of capital murder is an inadequate response to the harshness and inflexibility of a mandatory death sentence statute." *Roberts v. Louisiana,* 428 U.S. at 332, 96 S.Ct. at 3006.[9]

Secondly, the plurality found that the Mandatory Death Statutes enacted in North Carolina and Louisiana in response to *Furman* "have simply papered over the problem of unguided and unchecked jury discretion"; they do not "fulfill Furman's basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death."[10] *Woodson v. North Carolina,* 428 U.S. at 303, 96 S.Ct. at 2991.

Finally, the plurality concluded that before the death penalty may be constitution-

---

ment for a term of not less than two years nor more than life imprisonment in the State's prison." The Louisiana Death Penalty Statute [La.Rev.Stat.Ann. § 14.30 (1974)] required that the death penalty be imposed whenever the jury found the defendant guilty of first degree murder; which offense is defined as the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or

"(3) Where the offender has a specific intent to kill or to inflict great bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or

"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; [or]

"(5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.

"For the purposes of paragraph (2) herein, the term peace officer shall be defined and include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, district attorney, assistant district attorney or district attorney's investigator."

Since both the North Carolina and Louisiana Statutes imposed a mandatory death penalty for a "broad category of homicidal offenses," the plurality expressly reserved opinion as to the constitutionality of a mandatory provision limited to "an extremely narrow category of homicide," such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender. See *Woodson v. North Carolina,* 428 U.S. at 287, 96 S.Ct. at 2983 n. 7; *Roberts v. Louisiana,* 428 U.S. 334, 96 S.Ct. at 3006 n. 9. Similarly, we need not express an opinion as to the constitutionality of such a narrowly defined mandatory provision since the Delaware Statute falls within the "broad category" species invalidated by the *Woodson* and *Roberts* decisions.

9. For the dissenting views upon these conclusions, see Appendix Item 1.

10. For the dissenting views as to this conclusion, see Appendix Item 2.

ally imposed by either jury or judge as sentencing authority, there must be "particularized consideration of relevant aspects of the character and record of each convicted defendant" and of the "circumstances of the particular offense" in a bifurcated proceeding.[11] *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991. Both the North Carolina and the Louisiana Death Penalty Statutes lacked such provision.

For those reasons and upon those grounds, the plurality in *Woodson* and *Roberts,* with the concurrence in the judgment of the two members of the Court who hold to the view that capital punishment is unconstitutional *per se,* ruled for the Court that the Mandatory Death Sentence Statutes of North Carolina and Louisiana imposed "cruel and unusual punishment" in violation of the Eighth and Fourteenth Amendments. *Woodson v. North Carolina,* 428 U.S. at ——, 96 S.Ct. at 2992; *Roberts v. Louisiana,* 428 U.S. 305, 96 S.Ct. at 3008.

### IV.

■ The background and history of the subject from *Furman* through *Woodson* and *Roberts* have been spelled out in some detail in the interest of a better general understanding of the subject and of the rationale underlying the recent decisions of the United States Supreme Court.

Upon the basis of the foregoing, the conclusion is impelled that Delaware's Mandatory Death Penalty Statute has the same constitutional infirmities that the United States Supreme Court has found and declared fatal in the North Carolina and Louisiana Statutes. It follows that, under the authority of the *Woodson* and *Roberts* decisions, the mandatory death provision of 11 Del.C. § 4209(a) must fall as permitting "cruel and unusual punishment" in violation of the Eighth and Fourteenth Amend-

11. For the dissenting views upon these conclusions, see Appendix Item 3.

ments. The Attorney General and defense counsel are in accord on this point. We so hold.

### V.

■ As the consequence of this declaration of the invalidity of the first sentence of § 4209(a), all death sentences imposed thereunder must be set aside and lesser sentences imposed. The question then becomes this: What sentences may now be imposed in lieu of the void death sentences?

The answer is seemingly provided by the second sentence of § 4209(a): "If the penalty of death is determined to be unconstitutional the penalty for first degree murder shall be life imprisonment without benefit of parole." It is contended by the defendants, Foraker and Shields, however, that the second sentence of § 4209(a) is not severable from the first sentence and, accordingly, must fall with the first. They present alternate theories to support this contention: (1) that the intent of the General Assembly was to enact a death penalty and it so "intertwined" the two sentences of § 4209(a) as to make it "impossible to consider them statutorily separate"; and (2) that, since the recent decisions of the United States Supreme Court struck down the procedures followed in imposing the death sentence, and not the death sentence itself, the condition precedent for the operation of the second sentence of § 4209(a) has not occurred. It is also argued that the rule of *Dickerson* on severability (298 A.2d at 764–67) is inapposite because there two separate statutes were involved.

After careful consideration of these contentions, we find them untenable.

The second sentence of § 4209(a) may be "given effect" standing alone, thus meeting the tests of severability prescribed by 1 Del.C. § 308.[12] Moreover, the legisla-

12. 1 Del.C. § 308 provides:
"§ 308. Severability of provisions.
"If any provision of this Code or amendments hereto, or the application thereof to

tive intent is "manifest", indeed unquestionable, on the face of the Statute: i. e., that the second sentence of § 4209(a) was intended to become operative in the very event which has now occurred. Thus, severability is also mandated by 1 Del.C. § 301.[13] Any lingering doubt as to severability must be resolved in favor thereof by reason of the following provision of 59 Del.L. Ch. 284 by which § 4209 was enacted:

> "Section 4. If any provision of this Act or the application thereof to any person or circumstance, including any one or more of the enumerated instances which constitute first degree murder is held unconstitutional or otherwise invalid, such unconstitutionality or invalidity shall not affect any other provision or application of this Act, and to that end the provisions of this Act are declared to be severable."

■ We have also considered the argument of the defendant Shields that the penalty of life imprisonment without parole, as applied to him, would be unconstitutional because of his youth. In support of this contention, Shields cites *Workman v. Commonwealth*, Ky.Supr., 429 S.W.2d 374 (1968). We find *Workman* unpersua-

sive; instead, we adopt the rationale and conclusion of *People v. Isitt*, 55 Cal.App.3d 23, 127 Cal.Rptr. 279 (1976):

> "Stripped of its asserted constitutional basis, defendant's contention is thus reduced to a categorical insistence that the amelioration of a sentence of life without parole is required in any case where the defendant so qualifies by reason of his age. Such a construction is, of course, directly contrary to the legislative intent * * * that its application is confided to the sound discretion of the trial court." See generally, *Anno.*, 33 A.L.R.3d 335, § 7(a).

\* \* \* \* \* \*

Accordingly, we hold, that the "life imprisonment without benefit of parole" provision of § 4209(a) is severable and constitutionally valid as to all defendants.

### VI.

■ All defendants contend that if "life imprisonment without benefit of parole" is the mandated sentence to be imposed in lieu of the invalid death penalty provision, that sentence is, nevertheless, subject to the "diminution of confinement" provisions of 11 Del.C. §§ 4371, *et seq.*[14]

---

any person, thing or circumstances is held invalid, such invalidity shall not affect the provisions or application of this Code or such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable."

13. 1 Del.C. § 301 provides:
"§ 301. Rules of construction and definitions.
"The rules of construction and the definitions set forth in this chapter shall be observed in the construction of this Code and all other statutes, unless such construction would be inconsistent with the manifest intent of the Legislature, or repugnant to the Code or to the context of the same statute."

14. 11 Del.C. §§ 4371 and 4372 provide:
"§ 4371. When diminution given.
"A person committed to the Department may merit diminution of his confinement by his behavior, fidelity and compliance with the rules."

"§ 4372. Rate of reduction of confinement.
"When a person has not been guilty of any violation of discipline or any rules of the Department and has labored with diligence and fidelity, diminution of sentence shall be:
"(1) For each month commencing on the first day of his arrival at the facility there shall be a reduction of 5 days from the sentence;
"(2) When more than 1 year of a sentence has elapsed, less the reduction of sentence as provided in paragraph (1) of this section, then from that time there shall be a reduction of 7 days for each month of the sentence;
"(3) When more than 2 years of a sentence has elapsed, less the reduction of sentence as provided in paragraphs (1) and (2) of this section, then from that time there shall be a reduction of 9 days for each month of the sentence; and
"(4) When 3 or more years of a sentence has elapsed, less the reduction of sentences

The arguments are these: (1) While the prior statutory provision, § 4209(c), expressly stated that a "person sentenced to life imprisonment without benefit of parole shall be ineligible for parole or for merit or good behavior credits, but shall be confined during the balance of his life", the present § 4209(a) lacks that qualifying provision; (2) the concepts of good behavior credits, 11 Del.C. §§ 4371, *et seq.*, and parole, 11 Del.C. §§ 4341, *et seq.*, are basically and fundamentally different, one being mandatory and the other discretionary; and (3) the "good time" system provided for in our statutes is both humanitarian and administratively sensible; it serves the best interests of both the inmate and the correctional system in providing the inmate with an incentive to good behavior. For these three reasons, the defendants urge that § 4209(a) should be construed to preclude parole, but not good behavior credits.

Despite these appealing contentions, the defendants have been unable to answer the ultimate question: What statutory provision specifies the number of years from which good behavior credits are to be deducted when the sentence is life imprisonment without parole? No statutory base for the computation of "good time" upon such sentence has come to our attention. This is the fatal flaw in the defendants' argument.

In an attempt to resolve this dilemma, the defendants propose that this Court arbitrarily adopt for the applicability of good behavior credits under § 4209(a) the provision of the Parole Statute, 11 Del.C. § 4346(c), that for purposes of parole "a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years."

The adoption of such a rule would constitute an impermissible act of judicial legislation in that it would be an unwarranted

transfer and application of the provision of one statute to a second unrelated statute. If good behavior credits are to be accorded to a term of "life imprisonment without benefit of parole" under § 4209(a), the General Assembly must speak on the subject.

We conclude, therefore, that the provisions of § 4371, *et seq.* are not applicable to § 4209(a); and that "life imprisonment without benefit of parole" under § 4209(a) means confinement for the balance of the life of the person convicted of first degree murder.

The certified questions are answered in accordance with the foregoing.

## APPENDIX

*Item 1:*

Specifically addressing those conclusions, Mr. Justice White, joined in his dissenting opinion in *Roberts v. Louisiana*, by Chief Justice Burger, and Justices Blackmun and Rehnquist, stated:

"Louisiana and North Carolina have returned to the mandatory capital punishment system for certain crimes. Their legislatures have not deemed mandatory punishment, once the crime is proven, to be unacceptable; nor have their juries rejected it, for the death penalty has been imposed with some regularity. Perhaps we would prefer that these States had adopted a different system, but the issue is not our individual preferences but the constitutionality of the mandatory systems chosen by these two States. I see no warrant under the Eighth Amendment for refusing to uphold these statutes." (428 U.S. at 361–363, 96 S.Ct. at 3020)

And Mr. Justice Rehnquist in his dissent in *Woodson v. North Carolina*, stated that the willingness of at least 10 State Legislatures to enact mandatory death penalty Statutes in response to *Furman* "is utterly

as provided in paragraphs (1)–(3) of this section, then from that time there shall be

a reduction of 10 days for each month of the sentence."

inconsistent with the notion that they regarded mandatory capital sentencing as beyond 'evolving standards of decency.' The plurality's glib rejection of these legislative decisions as having little weight on the scale which it finds in the Eighth Amendment seems to me more an instance of their desire to save the people from themselves than a conscientious effort to ascertain the content of any 'evolving standard of decency.'" (428 U.S. at 313, 96 S.Ct. at 2996)

*Item 2:*

In his dissent, Justice Rehnquist refers to this as "the Court's latter-day recognition, some four years after the decision of the case, that *Furman* requires 'objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.'" (*Woodson v. North Carolina,* 428 U.S. at 319, 96 S.Ct. at 2998) He also stated that an effort to respond to the concerns expressed in *Furman* is "not an easy task considering the glossolalial manner in which those concerned were expressed." *Id.* at 2997.

Similarly, Mr. Justice White in his dissenting opinion in *Roberts v. Louisiana* added: "The plurality holds the Louisiana statute unconstitutional for want of a separate sentencing proceeding in which the sentencing authority may focus on the sentence and consider some or all of the aggravating and mitigating circumstances. In *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), after having heard the same issues argued twice before in *Maxwell v. Bishop,* see 395 U.S. 918, 89 S.Ct. 1768, 23 L.Ed.2d 236 (1969), we specifically rejected the claims that a defendant's 'constitutional rights were infringed by permitting the jury to impose the death penalty without governing standards' and that 'the jury's imposition of the death sentence in the same proceeding and verdict as determined the issue of guilt was [not] constitutionally permissible.' 402 U.S. at 185, 91 S.Ct. 1454. With respect to the necessity of a bifurcated criminal trial, we had reached essentially the same result in *Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). In spite of these cases, the plurality holds that the State must provide a procedure under which the sentencer may separately consider the character and record of the individual defendant, along with the circumstances of the particular offense, including any mitigating circumstances that may exist. For myself, I see no reason to reconsider *McGautha* and would not invalidate the Louisiana statute for its failure to provide what *McGautha* held it need not provide.

\* \* \*

"Implicit in the plurality's holding that a separate proceeding must be held at which the sentencer may consider the character and record of the accused is the proposition that States are constitutionally prohibited from considering any crime no matter how defined so serious that every person who commits it should be put to death regardless of extraneous factors related to his character. Quite apart from *McGautha v. California, supra,* I cannot agree. It is axiomatic that the major justification for concluding that a given defendant deserves to be punished is that he committed a crime. Even if the character of the accused *must* be considered under the Eighth Amendment, surely a State is not constitutionally forbidden to provide that the commission of certain crimes conclusively establishes that the criminal's character is such that he deserves death. Moreover, quite apart from the character of a criminal, a State should constitutionally be able to conclude that the need to deter some crimes and that the likelihood that the death penalty will succeed in deterring these crimes is such that the death penalty may be made mandatory for all people who commit them. Nothing resembling a reasoned basis for the rejection of these propositions is to be found in the plurality opinion."

\* \* \*

"As the plurality now interprets the Eighth Amendment, the Louisiana and

North Carolina statutes are infirm because the jury is deprived of all discretion once it finds the defendant guilty. Yet in the next breath it invalidates these statutes because they are said to invite or allow too much discretion: despite their instructions, when they feel that defendants do not deserve it die, juries will so often and systematically disobey their instructions and find the defendant not guilty or guilty of a noncapital offense that the statute fails to satisfy the standards of *Furman v. Georgia*. If it is truly the case that Louisiana juries will exercise *too much* discretion—and I do not agree that it is—then it seems strange indeed that the statute is also invalidated because it purports to give the jury too little discretion by making the death penalty mandatory. Furthermore if there is danger of freakish and too infrequent imposition of capital punishment under a mandatory system such as Louisiana's, there is very little ground for believing that juries will be any more faithful to their instructions under the Georgia and Florida systems where the opportunity is much, much greater for juries to practice their own brand of unbridled discretion." (428 U.S. at 356–360, 96 S.Ct. at 3017–19)

*Item 3:*

In his dissent in *Woodson*, Mr. Justice Rehnquist responded to this plurality view as follows:

"None of the cases half-heartedly cited by the plurality * * * comes within a light year of establishing the proposition that individualized consideration is a constitutional requisite for the imposition of the death penalty.

* * *

"The plurality's insistence on individualized consideration of the sentencing therefore depends not upon any traditional application of the prohibition against cruel and unusual punishment contained in the Eighth Amendment. The punishment here is concededly not cruel and unusual, and that determination has traditionally ended

judicial inquiry in our cases construing the Cruel and Unusual Punishment Clause. * * *. What the plurality opinion has actually done is to import into the Due Process Clause of the Fourteenth Amendment what it conceives to be desirable procedural guarantees where the punishment of death, concededly not cruel and unusual for the crime of which the defendant was convicted, is to be imposed. This is squarely contrary to *McGauth* and unsupported by any other decision of this Court." (428 U.S. at 321, 323–324, 96 S.Ct. at 2999–3000)