**Christopher WALLACE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 229, 2007.**

Supreme Court of Delaware.

Submitted: May 14, 2008.

Decided: Aug. 1, 2008.

Edmund M. Hillis, Esquire (argued) and Lisa A. Minutola, Esquire, Office of the Public Defender, Wilmington, DE, for appellant.

Paul R. Wallace, Esquire, Chief of Appeals Division, Department of Justice, Wilmington, DE, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

The defendant, Christopher Wallace ("the defendant" or "Wallace"), was indicted by a grand jury on one count of Murder in the First Degree (intentional homicide) and one count of Possession of a Deadly Weapon During the Commission of a Felony. Wallace waived his constitutional right to a trial by jury. Both the State and the defendant consented to having the issue of guilt or innocence decided after a bench trial.

The trial occurred over a period of six days during which the Superior Court received testimony from twelve witnesses and admitted seventy three exhibits into evidence. The trial judge found Wallace "guilty but mentally ill" of Murder in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony. Section 4209 of Title 11 establishes that, in cases not subject to the death penalty, the sentence for Murder in the

First Degree is life imprisonment without probation, parole or any other reduction.

The only question presented in this direct appeal is whether the imposition of a sentence of life without parole upon a defendant who, at the age of 15–3/4 years, killed his nine-year-old cousin is constitutionally disproportionate because that sentence violated either Article I, section 11 of the Delaware Constitution or the Eighth Amendment of the United States Constitution. We have concluded that Wallace's life sentence did not violate the Eighth Amendment and that his claim under the Delaware Constitution is waived. Therefore, the judgment and sentence of the Superior Court must be affirmed.

### Facts[1]

On November 27, 2005, nine-year-old Daniel Schlor, spoke into a video camera at a family gathering and stated that among the five things he most hated were number 1, "people that try to make me drunk" and number 5, "murderers." When he made those statements, Daniel was sitting on his grandmother's lap in the kitchen of his home. He was there that evening with his mother, Gloria Schlor, and two of his aunts.

Approximately thirty-six hours later, on the morning of November 29, 2005, Daniel's mother found him dead, covered in a blanket, lying face down on the floor of her basement recreation room. On November 30, 2005, Doctor Adrienne Sekula–Perlman, Deputy Chief Medical Examiner, performed an autopsy to determine the cause and manner of Daniel's death. The results were disconcerting when compared to Daniel's video taped statements recorded shortly before his murder: he had been strangled, stabbed and apparently forced to consume alcohol as he died. The trial

judge found beyond a reasonable doubt that the perpetrator of Daniel's brutal death was his 15–3/4 year-old cousin, Christopher Wallace.

Wallace was born on January 17, 1990, in New Orleans, Louisiana. He moved to Tennessee, then to Kentucky, and eventually settled in Florida with his mother, father and older brother. The evidence revealed a less than typical childhood.

Wallace, accompanied by his mother and other relatives, traveled to Wilmington, Delaware to visit with Mrs. Wallace's cousin, Gloria Schlor, and her family for the Thanksgiving holiday. They arrived in Wilmington on November 9, 2005, left the Schlor home to visit relatives in Long Island, New York, returned to Wilmington on the Monday before Thanksgiving, and stayed in Wilmington through the holiday.

The Schlor family consisted of Gloria Schlor, her boyfriend Wayne, her twin daughters, and her son Daniel, then nine years old. Mrs. Schlor, Wayne and the two girls slept upstairs. Daniel slept in a finished bedroom located in the basement of the home, adjacent to a finished recreation room. When the Wallace family visited, the adults slept upstairs and Wallace slept mainly on the floor in the basement recreation room.

All witnesses reported that Wallace was quite pleasant to be around while visiting the Schlor home. He did not display unusual behavior or violent tendencies toward anyone in the home, including Daniel. A video of Wallace interacting with two of the Schlor children (the twin girls) appears to bear this out. By all accounts, Wallace and Daniel got along fine and seemed to enjoy each other's company.

According to Gloria Schlor, on the morning of November 29, 2005, at approximately 1:00 a.m., Wallace's mother and his aunt

1. This factual recitation is taken from the Superior Court's decision.

left Delaware by pickup truck en route to Louisiana. There was no room in the truck for Wallace so his mother bought him an airline ticket to travel alone back to Florida the next day. Witnesses report that Daniel Schlor went to bed late on the evening of November 28 or early morning on November 29. Wallace was last seen going down to the basement, presumably for bed, around 2:00 a.m. on November 29. On the morning of November 29, 2005, at approximately 7:45 a.m., Mrs. Schlor went to get Daniel ready for school and found him lying dead on the floor of the recreation room in the basement, the victim of a violent knife attack.

Wallace was nowhere to be found. Police and paramedics responded to the Schlor home and a search for Wallace was commenced immediately thereafter. He was apprehended by the New Castle County Police at approximately 6:30 p.m. on November 29 after having been missing from the Schlor home all day. Wallace apparently had attempted to drive away in one of the Schlor vehicles but could not find the key to start the vehicle on a key ring he had taken from the kitchen. He then walked from the Schlor home to a concealed area near an office complex a few miles away, stayed there for several hours, and then moved on to a nearby gas station where he sat and waited to be apprehended.

The officers who took Wallace into custody noted that he was cooperative, calm and did not appear to be engaged in delusional behavior. Even though he was placed face down on the ground and handcuffed, there was no indication that he was agitated or slipping into a psychotic state

in response to this arguably threatening behavior by police. During the transport back to the New Castle County police station, Wallace made several incriminating statements while in the police vehicle, including: "I know I'm going to jail for a long time for this one" and a statement to the effect that his "MP3 player would be out of date by the time he got out of prison." He inquired how much jail time he was facing, asked about the officer's bullet proof vest, and asked whether he would be on the television show "COPS." He asked the officer to find some heavy metal music on the car radio, and specifically requested that the officer try to find some "Slayer," a heavy metal band.

At the New Castle County police station, Wallace filled out the pedigree paperwork without difficulty. At 8:03 p.m., Detectives Sczerba and Crowley entered the interview room where Wallace had been waiting. Wallace agreed to speak to the police.[2] He was read his *Miranda* rights and then signed the "Miranda Warning Form" after initialing each portion of the form as it was explained to him. Once the form was signed, Detective Sczerba left the interview room and Detective Crowley conducted the interview.

For the next twenty minutes or so, Detective Crowley and Wallace had a frank but pleasant discussion about several topics, including Wallace's experiences at school, his enjoyment of fighting, his family, his visit to Delaware and, eventually, the fact that he had killed his nine year old cousin in the basement of the Schlor home because his cousin had insulted and angered him.[3] While viewing the DVD re-

---

**2.** The trial judge determined that the police complied with applicable statutory and constitutional protections in the manner in which they detained Wallace and obtained his consent to conduct the interview over his father's objection, and that they had obtained a know-

ing, intelligent and voluntary waiver of Wallace's *Miranda* rights.

**3.** For reasons reflected on the record, the State elected to play only a portion of the taped statement in its case in chief. The trial

cording of this interview, the trial judge was struck by the defendant's remarkably poised and confident demeanor. He did not appear upset or shaken. Nor did he appear indecisive, confused or delusional. To the contrary, he was congenial in his demeanor and directly responsive to the police officer's inquiries. There were no eyewitnesses to the crimes. Nevertheless, from the evidence—particularly Wallace's own statements to the police, the testimony of the Assistant Medical Examiner, Dr. Adrienne Sekula–Perlman, and the physical evidence—the trial judge made factual findings as to how Wallace killed Daniel Schlor. The evidence revealed that Wallace inflicted three knife wounds upon Daniel Schlor's back (two of which were "superficial," i.e., where the knife was drawn across the back, and one of which was a stab wound, i.e., where the knife was plunged upwardly into the body through the back and into the spleen and lung). These wounds were inflicted while Daniel Schlor was on his knees facing Wallace.

There was a knife-inflicted stab/incised wound at the back of Daniel Schlor's head. There were also several incised knife wounds around his neck (indicating that the knife was drawn across the neck), including one that was quite large (approximately 3½ inches), and a stab wound. Daniel Schlor's hands revealed defensive wounds in the form of scratches and abrasions. The knife wounds were inflicted near the end of a prolonged attack and by two different weapons, one with a non serrated edge and one with a serrated edge. There were no "signatures" left at the crime scene, meaning that Wallace did not inscribe any messages in the physical location of the attack or on the body of his victim, or leave any other markers that

would suggest why he committed the crime.

According to Dr. Sekula–Perlman, Daniel Schlor was held down and strangled prior to the knife attack. The autopsy revealed substantial evidence of compression on the chest and upper body. There was hemorrhaging around the muscles in the neck and petechial hemorrhaging around the face. According to Dr. Sekula–Perlman, the strangulation was perpetrated with a ligature of some sort. The degree to which Daniel Schlor's brain was swollen indicated that Daniel Schlor died a slow death. The knife wounds were inflicted when he was near death, as evidenced by the relatively minimal loss of blood from the wounds. The toxicology studies revealed alcohol in Daniel Schlor's system. Based on the source of the blood samples that revealed the presence of alcohol, and those that did not, Dr. Sekula–Perlman opined that the alcohol was ingested very near death. Indeed, she opined that Daniel Schlor may have been forced to ingest the alcohol as he was dying.

The evidence indicated that death occurred as a result of the cumulative traumatic injuries suffered by Daniel Schlor, no one of which alone likely would have caused death. At the conclusion of her autopsy, Dr. Sekula–Perlman listed the cause of death as "multiple sharp force injuries and asphyxiation."

After the attack, Wallace covered Daniel Schlor's body with a blanket. According to police reports, he later explained that "it [was] the right thing to do because of what he did to these people." Wallace then gathered some clothes, placed them in a bag that he had taken from Daniel Schlor's room, and went upstairs. There he wrote a note, presumably to the Schlor

judge considered only this portion of the statement in determining whether the State

had proven the *prima facie* elements of the crimes charged.

family, which simply read "sorry."[4] He gathered some food, took a butcher's knife from a knife block in the kitchen, took some keys and left the home. He later indicated that his initial plan upon leaving the Schlor home was to try to make his way back to Florida.

When Wallace could not find an ignition key for any of the Schlor vehicles, however, he realized that his interstate travel plans were not realistic. He then walked a few miles from the Schlor home, slept in a concealed ditch area by the side of a road, and eventually was apprehended by police in the early evening hours while sitting on the curb outside of a busy gas station.

The last three days of the evidence presentation at trial were consumed by evidence related specifically to Wallace's mental status at the time of the offenses. Wallace provided proper notice of his intent to raise an insanity defense at trial. Thereafter, he was evaluated by three forensic mental health experts, two retained on his behalf and one retained on behalf of the State. The trial judge's findings of fact with respect to this evidence were summarized *seriatim* in the order of the experts' presentations at trial.

To find the defendant guilty of Murder in the First Degree on a theory that the defendant intentionally killed Daniel Schlor, as charged in the indictment, the trial judge had to find that the State proved the following elements beyond a reasonable doubt: (1) that Christopher Wallace caused the death of Daniel Schlor; and (2) that he acted intentionally, meaning that "it [was his] conscious object or purpose to cause the death of Daniel Schlor." The trial judge was satisfied be-

yond a reasonable doubt that the State met its burden to prove Murder in the First Degree. The evidence established that Wallace's attack on Daniel Schlor was prolonged, starting with strangulation and ending with a vicious knife attack.

According to Dr. Sekula–Perlman's unrebutted and credible description of the attack, Wallace literally would have seen and felt Daniel Schlor's life escape his body while the boy was in his grasp. He then followed the manual attack with multiple knife strikes to Daniel Schlor's back, head and neck. The slice wound across Daniel Schlor's neck reveals a strategically placed physical insult to Daniel Schlor's body that, by all appearances, was meant to seal his fate at or near the end of a brutal attack. In the absence of a legally recognized affirmative defense, the physical evidence, when coupled with Wallace's confession that he killed Daniel Schlor, left the trial judge with no reasonable doubt that Wallace was guilty as charged of Murder in the First Degree.

Before answering the question of whether Wallace's conduct fell within the statutory definition of "guilty but mentally ill," the trial judge considered whether it was appropriate to address that question at all. Neither party had squarely raised the issue at trial. The State contended that Wallace was unconditionally guilty of both indicted charges. Wallace contended that he was not guilty by reason of insanity. Nevertheless, the trial judge determined that he would have been obliged, *sua sponte,* to instruct a jury on the concept of "guilty but mentally ill" based on the evidence presented at trial.[5] Therefore, the

---

**4.** The trial judge was struck by the fact that the note, although comprised of only one word, was written with considerable care and effort. The letters were elaborately drawn and accompanied by a drawing of a sad face.

**5.** *See Daniels v. State,* 538 A.2d 1104, 1112 (Del.1988) (noting that Delaware's "guilty but mentally ill" statute states that the Court "shall" instruct the jury on the concept "where warranted by the evidence.").

trial judge, *sua sponte*, considered that question as the fact finder, without regard to the positions of either party. Delaware's "guilty but mentally ill" statute reads:

> Where the trier of fact determines that, at the time of the conduct charged, a defendant suffered from a *psychiatric disorder* which substantially disturbed such person's thinking, feeling or behavior, *and/or* that such *psychiatric disorder* left such person with insufficient willpower to choose whether the person would do the act or refrain from doing it, although physically capable, the trier of fact shall return a verdict of "guilty but mentally ill."[6]

The trial judge described his factual analysis of whether the evidence indicated that Wallace suffered from a psychiatric disorder, as "straightforward." Both the State's and the defendant's experts concluded that Wallace had an Axis I diagnosis. The State's expert, Dr. Stephen Mechanick, testified that the diagnosis was conduct disorder. The defense experts, Drs. Mandell Much and Kenneth Weiss testified that the diagnosis was schizophrenia, paranoid type. Although he initially testified that Wallace did not qualify for a finding of "guilty but mentally ill", when asked directly by the trial judge whether he was opining that Wallace's conduct disorder had not "substantially disturbed [Wallace's] thinking or behavior" at the time of the murder, Dr. Mechanick candidly acknowledged that he could render no such opinion.

Thus, regardless of whether the trial judge accepted the defense experts' opinions that Wallace was "guilty but mentally ill" (as a subset of their insanity opinions) as a result of schizophrenia, or the State's expert's tacit acknowledgment that he was "guilty but mentally ill" (as a result of ongoing conduct disorder), the verdict would be the same.[7] The trial judge's conclusion did not rely solely upon the trial experts' respective diagnoses. The mental health clinicians who evaluated Wallace while he was incarcerated consistently diagnosed him with various mental illnesses or psychiatric disorders. Notwithstanding Dr. Mechanick's skeptical view of these diagnoses, the Superior Court found them meaningful in the "guilty but mentally ill" analysis. In addition, Wallace's behavior, as observed by the trial judge in Wallace's video taped interview with the police and as described by those who have evaluated and interacted with him since then, was indicative of a young man whose mental health was not well.

In order to find the defendant "guilty but mentally ill", the trial judge noted that he was not required to reconcile the various diagnoses that were rendered by competent mental health professionals or to reach a definitive diagnosis for Wallace. The trial judge determined that it was enough that he found Wallace's condition fits within one of the three "bases" set forth in Section 401(b).[8] The trial judge then made a specific finding that Wallace was "guilty but mentally ill" under the "first basis,"—that is, a psychiatric disorder substantially disturbed his thinking and behavior at the time he committed the murder of Daniel Schlor.

---

**6.** Del.Code Ann. tit. 11, § 401(b) (2001)(emphasis supplied).

**7.** *See Aizupitis v. State,* 699 A.2d 1092, 1097 (Del.1997) (recognizing that the "first basis" for a GBMI verdict applies when the "underlying pathology of the defendant's psychiatric disorder [is] ongoing."). Dr. Mechanick explained that conduct disorder, as defined in DSM IV, involves a "repetitive and persistent pattern of behavior."

**8.** *Id.*

The trial judge found Wallace "guilty but mentally ill" of Murder in the First Degree and Possession of a Deadly Weapon During the commission of a Felony.[9] Wallace was sentenced to life imprisonment without parole on the murder conviction and to an additional five years imprisonment for the weapon conviction. Pursuant to Title 11, section 408(b), Wallace was transferred to the Delaware Psychiatric Center.

On March 25, 2008, the Delaware Psychiatric Center, pursuant to Title 11, section 408(b), applied to the Superior Court for an order transferring Wallace back to the custody of the Department of Correction. Included in the psychiatric center's application was the most recent and comprehensive mental health evaluation of Wallace. Based on that motion and evaluation, the Superior Court, on April 10, 2008, ordered the transfer of Wallace back to the Department of Correction.

### Plain Error Review

■ Because no objection was made to Wallace's sentence of life without parole at the time it was imposed in the Superior Court, it is reviewed for plain error.[10] "[P]lain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[11] Under the plain error doctrine, the defendant must first establish that there is an "error."[12] In addition, the error must be "plain" or "obvious" under the law at the time of the appeal.[13]

### State Constitutional Claim Waived

■ Article I, section 11 of the Delaware Constitution of 1897 provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."[14] In his opening brief, Wallace merely recites the language of this Delaware State Constitutional provision and makes a passing reference to it in his request for relief on appeal. This Court has held that "conclusory assertions that the Delaware Constitution has been violated will be considered to be waived on appeal."[15]

■ A proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the following non-exclusive criteria: "textual language, legislative his-

9. Del.Code Ann. tit. 11, § 636; Del.Code Ann. tit. 11, § 1447 (2005).

10. *Austin v. State*, 2001 WL 898621, at *2 (Del.Supr.).

11. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

12. *Capano v. State*, 781 A.2d 556, 662–63 (Del.2001).

13. *Johnson v. State*, 813 A.2d 161, 165–66 (Del.2001); *Capano v. State*, 781 A.2d at 663 nn. 466–67.

14. Del. Const. art. I, § 11.

15. *Ortiz v. State*, 869 A.2d 285, 291 n. 4 (Del.2005) (providing a framework for addressing Delaware Constitutional arguments). *Accord Demby v. State*, 2008 WL 534273, at *3 n. 22 (Del.Supr.); *Sykes v. State*, 2008 WL 343822, at *3 n. 5 (Del.Supr.); *Jones v. State*, 940 A.2d 1, 7 n. 8 (Del.2007); *Christopher v. State*, 930 A.2d 894, 895 n. 1 (Del.2007); *Fahmy v. State*, 2006 WL 2842726, at *2 n. 12 (Del.Supr.); *Mathis v. State*, 2006 WL 2434741, at *3 (Del.Supr.); *Randall v. State*, 2006 WL 2434912, at *3 (Del.Supr.); *Sisson v. State*, 903 A.2d 288, 313 n. 113 (Del.2006); *Smith v. State*, 913 A.2d 1197, 1232 n. 79 (Del.2006); *Mills v. State*, 2006 WL 1027202, at *4 n. 23 (Del.Supr.). *See also Flamer v. State*, 2008 WL 2588703, at *2 (Del.2008) (addressing similar concerns unrelated to the *Ortiz* footnote).

tory, preexisting state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes."[16]  Simply reciting that his sentence of life without parole violates Article I, section 11, without more, is a conclusory statement.  A proper presentation of an alleged violation of the Delaware Constitution was not made to the Superior Court nor has one been made to us on appeal.  Accordingly, Wallace's argument that the search violated the Delaware Constitution has been waived.[17]

### Eighth Amendment Not Violated

One purpose of the rule of law is to encourage responsible behavior.  The preservation and protection of human life has always been of paramount importance in all civilized societies.  The United States Supreme Court recently emphasized the distinction between intentional first degree murder and non-homicide crimes against individual persons.[18]  The Supreme Court stated that "the latter crimes may be devastating in their harm ... but 'in terms of moral depravity and of the injury to the person and to the public,' they cannot compare to murder in their 'severity and irrevocability.' "[19]  Consequently, intentional Murder in the First Degree is considered to be the most serious crime and one that is often related to the death penalty for competent adult offenders.[20]

The Eighth Amendment, which is applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[21]  Recently, the United States Supreme Court reaffirmed that the "National Government and, beyond it, the separate States are bound by the proscriptive mandates of the Eighth Amendment to the Constitution of the United States, and all persons within those respective jurisdictions may invoke its protection."[22]

The Eighth Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive."[23]  In *Atkins* and *Roper*,[24] the United States Supreme Court explained that the Eighth Amendment's proscription of excessive or cruel and unusual punishments flows from the basic "precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense."[25]  Applying these principles in *Roper* and *Atkins*, the United States Supreme Court held that the execution of juveniles and mentally retarded persons

16.  *Ortiz v. State*, 869 A.2d at 291 n. 4.

17.  *See Ortiz v. State*, 869 A.2d at 291 n. 4 (Del.2005) ("In the future, conclusory assertions that the Delaware Constitution has been violated will be considered to be waived on appeal."); *accord Demby v. State*, 2008 WL 534273, at *3.

18.  *Kennedy v. Louisiana*, — U.S. —, —, 128 S.Ct. 2641, 2644, 171 L.Ed.2d 525, — (2008).

19.  *Id.* (quoting *Coker v. Georgia*, 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion)).

20.  *Dutton v. State*, 452 A.2d 127, 135 (Del. 1982).

21.  U.S. Const. amend. VIII.

22.  *Kennedy v. Louisiana*, 128 S.Ct. at 2645.

23.  *Atkins v. Virginia*, 536 U.S. 304, 311 n. 7, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

24.  *Id.* at 311, 122 S.Ct. 2242; *Roper v. Simmons*, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

25.  *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

are punishments violative of the Eighth Amendment.[26]

█ The Eighth Amendment has been interpreted to prohibit only punishments that are *disproportionate* to the crime or are *excessive*.[27] Proportionality determinations require an examination of "evolving standards of decency that mark the progress of a maturing society" in deciding a punishment's constitutionality.[28] Assessing evolving standards of decency under the proportionality review initially requires "objective evidence of the country's present judgment concerning the acceptability of [a given punishment] as a penalty for [the crime being tried],"[29] or, in other words, "sufficient evidence at present of a national consensus."[30] Objective indicia of society's standards may be found in legislative enactments.[31]

█ Under Delaware's constitutional separation of powers, it is the legislature's function to "make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offense."[32] For decades juveniles tried as adults for Intentional Murder in the First Degree have regularly received mandatory non-parolable life sentences as required by Delaware statutes.[33] More than thirty years ago when addressing the constitutional attack against Title 11, section 4209 by a sixteen-year-old murderer, this Court "considered the argument of the defendant ... that the penalty of life imprisonment without parole, as applied to him, would be unconstitutional because of his youth."[34] In that case, we held "that the 'life imprisonment without benefit of parole' provision of § 4209 is severable and constitutionally

**26.** *See Roper v. Simmons,* 543 U.S. at 571–72, 125 S.Ct. 1183; *Atkins v. Virginia,* 536 U.S. at 318–20, 122 S.Ct. 2242.

**27.** *See Atkins v. Virginia,* 536 U.S. at 311, n. 7, 122 S.Ct. 2242; *Weems v. United States,* 217 U.S. at 371, 30 S.Ct. 544 (stating that Eighth Amendment is "directed '... against all punishments which, by their excessive length or severity, are greatly disproportioned to the offenses charged' ... 'The whole *inhibition is* against that which is excessive in the ... punishment inflicted.'" (quoting *O'Neil v. Vermont,* 144 U.S. 323, 339–40, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (Field, J., dissenting))); *see also Roper v. Simmons,* 543 U.S. at 560, 125 S.Ct. 1183 ("[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions.").

**28.** *Trop v. Dulles,* 356 U.S. 86, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion).

**29.** *Coker v. Georgia,* 433 U.S. at 593, 97 S.Ct. 2861; *see also Atkins v. Virginia,* 536 U.S. at 312, 122 S.Ct. 2242.

**30.** *Roper v. Simmons,* 543 U.S. at 563, 125 S.Ct. 1183.

**31.** *See Roper v. Simmons,* 543 U.S. at 564–68, 125 S.Ct. 1183; *Atkins v. Virginia,* 536 U.S. at

313–17, 122 S.Ct. 2242; *Penry v. Lynaugh,* 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Stanford v. Kentucky,* 492 U.S. 361, 369–73, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).

**32.** *State v. Sturgis,* 947 A.2d 1087, 1090 (Del. 2008) (quoting *United States v. Hudson & Goodwin,* 7 Cranch 32, 11 U.S. 32, 34, 3 L.Ed. 259 (1812)).

**33.** Del.Code Ann. tit. 11, § 4209. *See, e.g., Torres v. State,* 1992 WL 53406, at *1 (Del. Supr.) (15 year-old was convicted of eight counts of murder in the first degree and sentenced to eight consecutive terms of life imprisonment without possibility of probation or parole or any other reduction); *Dickerson v. State,* 1993 WL 541913, at *1 (Del.Supr.) (17 year-old drug dealer who contracted to have rival shot and killed sentenced to life in prison without the possibility of probation, parole or other sentence reduction.); *Jones v. State,* 940 A.2d 1 (Del.2007) (17 year-old sentenced to multiple natural life sentences for murder of man and fiancée).

**34.** *State v. Spence,* 367 A.2d 983, 989 (Del. 1976).

valid as to *all* defendants."[35] More recently, the Superior Court reaffirmed the constitutionality of the mandatory natural life sentence provision in the face of an Eighth Amendment challenge by a juvenile murderer.[36]

Every state provides some mechanism for the imposition of adult sentences on a juvenile offender for at least some sort of crime.[37] In other jurisdictions, there is no evident trend away from imposing serious adult criminal liability upon juvenile offenders. According to the State's Answering Brief in this appeal, in forty-nine states, the age at which a first degree murderer can face adult disposition is fourteen years or younger.[38] Forty-two states permit the sentencing of juveniles to life without parole.[39] In twenty-seven of those states, the sentence is mandatory for anyone, child or adult, found guilty of Murder in the First Degree.[40] The State submits that in the past twenty years, courts have consistently rejected Eighth Amendment claims made by juvenile murderers attacking their life sentences.[41]

In *Roper*, the United States Supreme Court noted the "particular trend in recent years toward cracking down on juvenile crime."[42] However, in *Roper*, the United States Supreme Court concluded that "neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders."[43] The Supreme Court nevertheless also stated that it could not "deny or overlook the brutal crimes too many juvenile offenders have committed."[44] Consequently, it held that "when a juvenile offender commits a heinous crime, the State can exact forfei-

---

35. *Id.* (emphasis added).

36. *State v. Wonnum*, 2006 WL 2808148, *1 (Del.Super.Ct., Sept. 22, 2006) (mandatory life sentence given to 17 year-old for felony murder did not violate state or federal prohibition against cruel and unusual punishment), *rev'd on other grounds*, 942 A.2d 569 (Del. 2007).

37. *See* Howard N. Snyder & Melissa Sickmund, *Juvenile Offenders and Victims: 2006 National Report*, Chapter 4, p. 111 (U.S. Dep't of Justice, Office of Justice Programs, Office of Juvenile Justice & Delinquency Prevention 2006).

38. *Id.* at 111–14.

39. *Id.*

40. Amnesty International, *Human Rights Watch, The Rest of Their Lives: Life Without Parole for Child Offenders in the United States*, p. 1 (2005).

41. In support of that contention, the State cites the following cases: *Rice v. Cooper*, 148 F.3d 747, 752 (7th Cir.1998); *Harris v. Wright*, 93 F.3d 581, 583–85 (9th Cir.1996); *Rodriguez v. Peters*, 63 F.3d 546, 566–67 (7th Cir.1995); *Foster v. Withrow*, 159 F.Supp.2d 629, 645–46 (E.D.Mich.2001), *aff'd*, 42 Fed. Appx. 701 (6th Cir.2002); *Valenzuela v. People*, 856 P.2d 805, 810 (Colo.1993); *Tate v. State*, 864 So.2d 44, 54 (Fla.Dist.Ct.App. 2003); *Phillips v. State*, 807 So.2d 713, 716–17 (Fla.Dist.Ct.App.2002); *People v. Cooks*, 271 Ill.App.3d 25, 207 Ill.Dec. 734, 648 N.E.2d 190, 200 (1995); *State v. Pilcher*, 655 So.2d 636, 643–44 (La.Ct.App.1995); *People v. Bentley*, 2000 WL 33519653, at *2 (Mich.Ct. App.); *People v. Launsburry*, 217 Mich.App. 358, 551 N.W.2d 460, 463 (1996); *State v. Garcia*, 561 N.W.2d 599, 609 (N.D.1997); *Commonwealth v. Carter*, 855 A.2d 885, 892 (Pa.Super.Ct.2004); *State v. Jensen*, 579 N.W.2d 613, 624–25 (S.D.1998); *State v. Howell*, 34 S.W.3d 484, 494 (Tenn.Crim.App. 2000); *Laird v. State*, 933 S.W.2d 707, 714 (Tex.Ct.App.1996); *Speer v. State*, 890 S.W.2d 87, 92–3 (Tex.Ct.App.1994); *State v. Loukaitis*, 97 Wash.App. 1090, 1999 WL 1044203, at *13; *State v. Massey*, 60 Wash.App. 131, 803 P.2d 340, 348 (1990); *State v. Stevenson*, 55 Wash.App. 725, 780 P.2d 873, 880 (1989).

42. *Roper v. Simmons*, 543 U.S. at 566, 125 S.Ct. 1183.

43. *Id.* at 572, 125 S.Ct. 1183.

44. *Id.*

ture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity."[45]

In *Roper*, the United States Supreme Court stated that "it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person."[46] We conclude that the United States Supreme Court, in *Roper*, would not have recognized a sentence of life without parole as an acceptable alternative to death as a punishment for juveniles who commit intentional Murder in the First Degree, if such a sentence would violate the Eighth Amendment. Accordingly, we hold that Wallace's argument to the contrary is without merit.

### Conclusion

The judgment of the Superior Court and the sentence of life, without probation or parole or any other reduction, are affirmed.

---

**45.** *Id.* at 574, 125 S.Ct. 1183.

**46.** *Id.* at 572, 125 S.Ct. 1183.