STATE of Missouri, Respondent,

v.

Antonio A. ANDREWS, Appellant.

No. SC91006.

Supreme Court of Missouri,
En Banc.

Dec. 21, 2010.

As Modified on Denial of Rehearing
Jan. 25, 2011.

Brocca Smith, Public Defender's office, St. Louis, for Andrews.

Evan J. Buchheim and Shaun J. Mackelprang, Attorney General's Office, Jefferson City, for the State.

ZEL M. FISCHER, Judge.

Antonio Andrews appeals the jury's verdict finding him guilty of first degree murder for shooting and killing a police officer and the sentence imposed on him for that crime of life without parole. This case came directly to this Court because Andrews challenges the constitutional validity of two Missouri statutes. He challenges Missouri's juvenile-certification statute, § 211.071, RSMo 2000, as violating his right to a jury trial in a criminal prosecution under the Sixth Amendment as applied in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). He also challenges the validity of the mandatory sentencing of a minor to life without parole for committing first degree murder as prescribed by § 565.020, RSMo 2000, as violating the Eighth Amendment prohibition against cruel and unusual punishment. In addition, Andrews appeals the jury's verdict claiming that there was insufficient evidence from which a reasonable jury could conclude Andrews committed first degree murder. Finally, Andrews claims the trial court erred by overruling his motion in limine, which sought to prevent uniformed police officers from being present during the jury trial. Affirmed.

## Facts

On August 15, 2007, Andrews, a 15–year–old male, and three friends were hanging out on a porch in St. Louis. Andrews and one of his friends, Lamont Johnson, decided to walk down to the corner to pick up some Chinese food. Before leaving, Andrews requested and was given a .38 caliber revolver by one of his other friends to carry on the walk to the restau-

rant. During this walk, Officer Norvelle Brown attempted to stop and question Andrews and Johnson. Both Andrews and Johnson fled; Brown pursued them in his patrol car. Andrews eventually stopped in a vacant lot, where he told Johnson that he was "tired of him chasing us." Andrews then pulled the revolver out of his pocket and waited for Brown to arrive. When Brown stopped his car in the alley and got out, Andrews shot him once in the upper back. Officer Brown died later that night due to his injury.

Because Andrews was a minor, the juvenile justice system had exclusive original jurisdiction over him pursuant to § 211.031, RSMo Supp.2007.[1] On December 26, 2007, a judgment that included findings of fact and conclusions of law was entered certifying Andrews to be prosecuted under the general laws of the State of Missouri. The judgment found and concluded that the juvenile justice system could not rehabilitate Andrews before his 21st birthday when it would lose jurisdiction.

On January 31, 2008, Andrews was indicted for first degree murder and armed criminal action. In Andrews' trial, the jury was given instructions on both first and second degree murder. On August 12, 2009, the jury announced its verdict, which found Andrews guilty of first degree murder and armed criminal action. He waived jury sentencing and was sentenced by the circuit court to life without parole for first degree murder, the only sentence available under § 562.020.2, RSMo 2000; *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). He was also sentenced to a consecutive 50-year sentence for armed criminal action.

1. Because Andrews committed his crime on August 15, 2007, his constitutional challenges

## Point I: Constitutional Challenges

Andrews challenges the procedure of juvenile certification under § 211.071, RSMo 2000, as unconstitutional because he alleges that by certifying his case, the juvenile division increased his punishment based on facts that have not been submitted to a jury and proven beyond a reasonable doubt in violation of *Apprendi.* Andrews also challenges the validity of § 565.020, which requires a sentence of a minor to life without parole for committing first degree murder as violating the Eighth Amendment prohibition against cruel and unusual punishment.

### Standard of Review

■ Statutory interpretation is an issue of law that is reviewed *de novo,* giving no deference to the trial court's determination. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). "A statute is presumed to be constitutional and will not be invalidated unless it clearly and undoubtedly violates some constitutional provision and palpably affronts a fundamental law embodied in the constitution." *Bd. of Educ. of City of St. Louis v. State,* 47 S.W.3d 366, 368–69 (Mo. banc 2001) (internal citations omitted).

### A

### Analysis of Andrews' Certification by the Juvenile Division

■ Section 211.031 gives exclusive original jurisdiction to the juvenile justice system over all children under the age of 17. However, § 211.071.1 allows the juvenile division to hold a hearing and dismiss at its discretion any case that involves a child between the age of 12 and 17 who is alleged to have committed a felony. If the child is alleged to have committed first

are to the statutes that were in effect at that time.

degree murder or one of the other serious crimes listed in § 211.071.1, then the hearing is mandatory. While the juvenile division has discretion in making the decision as to whether to certify the child, it must analyze ten factors listed in § 211.071.6 and set out its reasons for certifying the juvenile in a judgment. The effect of certifying a juvenile is to transfer jurisdiction over that individual's case to a court of general jurisdiction and to allow the child to be prosecuted as an adult under the general law. § 211.071, RSMo 2000.

Andrews argues that this certification in effect is a sentence enhancement. He argues that certification increases the punishment placed on the child for committing a felony because the juvenile system only maintains jurisdiction until the child is 21 years old. § 211.041, RSMo 2000. This places an upper limit on the length of sentence that the juvenile division can impose on a child. In Andrews' case, he claims that his certification increased his sentence for first degree murder from six years to life without parole. He asserts that because the juvenile division considered the ten factors set out in § 211.071.6 in determining whether to certify his case, then, these ten factors must be determined by a jury and proven beyond a reasonable doubt pursuant to *Apprendi*.[2]

■ In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The Court stated that this analysis applied to any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's verdict." *Id.* at 494, 120 S.Ct. 2348. *Apprendi* limited a trial court from sentencing a criminal defendant to a penalty that exceeds the statutory maximum sentence based on any fact not determined by a jury and proven beyond a reasonable doubt. *Id.* at 482–83, 120 S.Ct. 2348. *Apprendi*, however, did not make it impermissible for a court to exercise its discretion in imposition of a judgment within the range of sentence provided by statute. *Id.* at 481, 120 S.Ct. 2348.

The juvenile division's consideration of the statutorily defined criteria in determining whether it should retain jurisdiction over a juvenile is not the type of factual determination that was understood to be within the jury's domain by the framers of the Bill of Rights and, therefore, is not controlled by *Apprendi* and its progeny. In fact, the determination of those criteria

2.  The ten factors as set out in § 211.071.6, RSMo 2000, are as follows:

(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

(2) Whether the offense alleged involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

(6) The sophistication and maturity of the child as determined by consideration of his home and environmental situations, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

does not increase the statutory maximum punishment the juvenile will face; it only determines which court has final jurisdiction over the juvenile. The statutory maximum punishment is established by statutes found in the criminal code, not by a juvenile division in a certification proceeding.

The United States Supreme Court most recently articulated the limited nature of the *Apprendi* decision in *Oregon v. Ice*, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009). The Court held that the Sixth Amendment right to a jury trial, as interpreted in *Apprendi*, did not apply to findings of fact required under state law as a predicate to imposing consecutive, rather than concurrent, sentences on an offender. *Id.* at 714–15. In reaching this holding, the Court explained that the holdings of *Apprendi* and its progeny were based on the historic jury function of deciding whether the State has proved each element of the offense beyond a reasonable doubt and that the Court had not extended these holdings beyond the offense-specific context of those cases:

> Those decisions are rooted in the historic jury function—determining whether the prosecution has proved each element of an offense beyond a reasonable doubt. They hold that it is within the jury's province to determine any fact (other than the existence of a prior conviction) that increases the maximum punishment authorized for a particular offense. Thus far, the Court has not extended the *Apprendi* and *Blakely* [*v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)] line of decisions beyond the offense-specific context that supplied the historic grounding for the decisions.

*Id.* at 714. The Court noted that application of *Apprendi*'s rule to other contexts must be consistent with the "longstanding common-law practice." *Id.* at 717 (quoting *Cunningham v. California*, 549 U.S. 270, 281, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007)). "The rule's animating principle is the preservation of the jury's historic role as the bulwark between the State and the accused at the trial for an alleged offense." *Id.* In determining whether the legislature has encroached "on the jury's traditional domain" given it by the Sixth Amendment, the Court considers "whether the finding of a particular fact was understood as within 'the domain of the jury ... by those who framed the Bills of Rights.'" *Id.* (quoting *Harris v. United States*, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion)). "In undertaking this inquiry," the Court noted that it must "remain cognizant that administration of a discrete criminal justice system.is among the basic sovereign prerogatives States retain." *Ice*, 129 S.Ct. at 717. Because the "decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law,'" the Court held that the rule in *Apprendi* did not apply. *Id.* (quoting *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2348).

The Court also noted that it did not want to extend the holding in *Apprendi* beyond its constitutional mooring by stating that:

> There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused. Instead, the defendant—who historically may have faced consecutive sentences by default—has been granted by some modern legislatures statutory protections meant to temper the harshness of the historical practice.

*Id.* at 718.

The Court noted that the scope of the Sixth Amendment right to a jury trial is

delineated by the historical role of the jury at common law and that it does not attach to every contemporary state law that requires predicate findings of fact: "[a]s we have described, the scope of the constitutional jury right must be informed by the historical role of the jury at common law. It is therefore not the case that, as [defendant] suggests, the federal constitutional right attaches to every contemporary state-law 'entitlement' to predicate findings." *Id.* at 718 (internal citations omitted).

The Court's decision to limit *Apprendi* to what was necessary to protect the core concerns of the Sixth Amendment also was influenced by the respect that must be given the States' sovereign interest in administering their criminal justice systems:

> States' interest in development of their penal systems, and their historic dominion in this area, also counsel against the extension of *Apprendi* that [defendant] requests. Beyond question, the authority of States over the administration of their criminal justice systems lies at the core of their sovereign status. We long recognized the role of the States as laboratories for devising solutions to difficult legal problems. This Court should not diminish that role absent impelling reason to do so.

*Id.* at 718–19 (internal citations omitted).[3]

The creation of juvenile codes and the placing of juvenile offenders within the exclusive jurisdiction of juvenile divisions is a relatively modern legislative development. *See Hidalgo v. State,* 983 S.W.2d 746, 750 n. 8 (Tex.Crim.App.1999) (noting that the first juvenile court was created in Illinois in 1899 and that by 1925 all but two

states had juvenile systems.) The juvenile justice system that exists today certainly was not known when the Bill of Rights was adopted. At that time in our history, juvenile offenders were treated no differently from adult offenders and were prosecuted in courts of general jurisdiction. All states rightfully have adopted some type of juvenile justice system that precludes criminal prosecution of certain juveniles but allows for the relinquishment of juvenile-certification proceedings. The United States Supreme Court has held that while certain rights enumerated within the Bill of Rights apply to juvenile adjudications, the Sixth Amendment right to a jury trial does not. *See In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (applying various due process rights to juvenile proceedings including notice of charges, right to counsel, right of confrontation and cross-examination, and privilege against self-incrimination); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (proof-beyond-reasonable-doubt standard applies to delinquency proceedings); *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (double jeopardy protection applies to delinquency proceedings); *but see McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that a trial by jury is not constitutionally required for juvenile court adjudications).

The courts in every jurisdiction that have juvenile-certification statutes similar to Missouri's and that have considered this issue have concluded that *Apprendi*'s rule does not apply to juvenile transfer or certification proceedings and that there is no constitutional right to a jury determination

---

**3.** Justice Ginsberg's majority opinion in *Ice* signals a change in the Court's Sixth Amendment right-to-jury-trial analysis in that it emphasizes and embraces for the first time these historical and sovereignty-based arguments expressed by the previous dissenting opinions in the *Apprendi* line of cases. *See Ice,* 555 U.S. at ——, 129 S.Ct. at 721 (Scalia, J. dissenting). *See also State v. Rudy B.,* 149 N.M. 22, 243 P.3d 726 (2010).

respecting the transfer of a juvenile's case to a court of general jurisdiction. *State v. Rudy B.*, 149 N.M. 22, 243 P.3d 726 (2010) (*Apprendi* does not apply to the evidentiary hearing to determine whether a juvenile adjudicate as a youthful offender should be sentenced as a juvenile or as an adult); *see also State v. Jones*, 273 Kan. 756, 47 P.3d 783, 798 (2002), *cert. denied*, 537 U.S. 980, 123 S.Ct. 444, 154 L.Ed.2d 341 (2002) (*Apprendi* does not apply to juvenile waiver hearings because they only determine "which system will be appropriate for a juvenile offender."); *Gonzales v. Tafoya*, 515 F.3d 1097, 1112 (10th Cir. 2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 211, 172 L.Ed.2d 156 (2008); *United States v. Miguel*, 338 F.3d 995, 1004 (9th Cir.2003) ("*Apprendi* does not require that a jury find the facts that allow the transfer to district court. The transfer proceeding establishes the district court's jurisdiction over defendant"); *United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000) (rejecting the claim that the transfer of a juvenile to an adult court increases punishment and holding that it "merely establishes a basis for district court jurisdiction") (internal quotations omitted); *People v. Beltran*, 327 Ill.App.3d 685, 262 Ill. Dec. 463, 765 N.E.2d 1071, 1075–76 (2002) (concluding that *Apprendi* does not apply to a decision to prosecute the defendant as an adult because a transfer hearing "is dispositional, not adjudicatory"); *Caldwell v. Commonwealth*, 133 S.W.3d 445, 452–53 (Ky.2004) (adopting the "jurisdiction" argument); *State v. Rodriguez*, 205 Ariz. 392, 71 P.3d 919, 927–28 (Ariz.Ct.App.

2003) (holding that a juvenile transfer statute "is not a sentence enhancement scheme and, therefore, does not implicate *Apprendi* . . . [because it] does not subject [a] juvenile to enhanced punishment; it subjects the juvenile to the adult criminal justice system."); *In re Welfare of J.C.P.*, 716 N.W.2d 664, 668 (Minn.App.2006); *State v. Kalmakoff*, 122 P.3d 224, 227 (Alaska App.2005); *Bucio v. Sutherland*, 674 F.Supp.2d 882, 901 (S.D.Ohio 2009).[4]

After consideration of Missouri's statutory scheme regarding homicide offenses and United States Supreme Court precedent expressly limiting *Apprendi* to the offense-specific context that supplied the historic grounding for the decision, *Apprendi* is inapplicable to a certification hearing. The maximum sentence for a person under age 18 for first degree murder is life without parole. § 565.020; *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The certification of Andrews did not enhance the potential maximum sentence for the crime he was alleged to have committed. His certification did not expose him to any greater punishment than authorized by the jury's verdict as required to violate *Apprendi*. 530 U.S. at 494, 120 S.Ct. 2348. This is because the judgment that certified Andrews to be tried as an adult did not impose any sentence on him whatsoever. Instead, it only determined that his case would be heard in a circuit court of general jurisdiction rather than the juvenile division of the circuit court—a decision to which other courts have determined *Ap-*

4. The one court that has applied *Apprendi's* rule in juvenile-certification proceedings had juvenile-certification statutes radically different than Missouri's statutes and the statutes involved in the cases above. In *Commonwealth v. Quincy Q.*, 434 Mass. 859, 753 N.E.2d 781 (2001) (overruled on other grounds by *Commonwealth v. King*, 445 Mass. 217, 834 N.E.2d 1175, 1201 n. 28 (2005)), the court held that *Apprendi's* rule applied because New Jersey's "youthful offender statute authorizes judges to increase the punishment for juveniles convicted of certain offenses beyond the statutory maximum otherwise permitted for juveniles" if certain factual findings are made. *Id.* at 789. This scheme is readily distinguishable from Missouri's juvenile-certification proceedings.

*prendi* does not apply. *See e.g. Gonzales v. Tafoya,* 515 F.3d 1097, 1116 (10th Cir. 2008), *and United States v. Miguel,* 338 F.3d 995, 1004 (9th Cir.2003).

Prior to his certification, Andrews was not a criminal defendant. Only after his certification was Andrews entitled to the right to a jury trial under both the United States and Missouri constitutions. *McKeiver,* 403 U.S. at 541, 91 S.Ct. 1976; *In re Fisher,* 468 S.W.2d 198, 202 (Mo. 1971). Until then he was not entitled to the right to a jury trial upon which the decision in *Apprendi* is based. Upon his certification, however, his case was tried in front of a jury where the State had to prove all elements of first degree murder beyond a reasonable doubt for him to receive the maximum sentence of life without parole.[5] If the jury did not find all of the elements of first degree murder, it had the option to convict Andrews of second degree murder or to acquit him. After the jury returned its verdict finding him guilty of first degree murder, the judge then sentenced him to the only remaining sentence authorized by law and in compliance with *Apprendi.* 530 U.S. at 497, 120 S.Ct. 2348. Therefore, Andrews has failed to demonstrate that § 211.071 clearly and undoubtedly violates the Sixth Amendment and, as such, this Court will not declare it unconstitutional.

### B

### Analysis of Andrews' Challenge to his Mandatory Sentence of Life without Parole

■ Pursuant to § 565.020, the punishment for first degree murder "shall be either death or imprisonment for life without eligibility for probation or parole...."

In *Roper v. Simmons,* the United States Supreme Court held that it was cruel and unusual punishment in violation of the Eighth Amendment to sentence an individual under the age of 18 to death. 543 U.S. 551, 125 S.Ct. 1183. Because *Roper* removed the possibility of sentencing a minor to death, § 565.020 makes life without parole the only sentence available for a minor found guilty of first degree murder. Citing *Graham v. Florida,* —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), Andrews argues that this mandatory sentence is unconstitutional because it violates the Eighth Amendment's prohibition against cruel and unusual punishment.

In *Graham,* the United States Supreme Court considered whether the constitution permits a juvenile offender to be sentenced to life without parole for a nonhomicide offense. *Id.* at 2018. The Court looked at "the evolving standards of decency that mark the progress of a maturing society" in answering this question. *Id.* at 2021 (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). It then determined that sentencing a minor to life without parole for a nonhomicide crime was cruel and unusual punishment because the lessened degree of culpability that minors have makes them "less deserving of the most severe punishments." *Graham, id.* at 2026 (citing *Roper,* 543 U.S. at 569, 125 S.Ct. 1183). Andrews argues that this reasoning should be extended to § 565.020 because it results in minors receiving a mandatory, non-discretionary sentence of permanent incarceration for committing first degree murder.

Andrews' argument is flawed because *Roper* expressly and *Graham* implicitly recognize that life without parole is not cruel and unusual punishment for a minor

---

**5.** The United States Supreme Court held in *Roper* that giving a minor the death sentence violates the prohibition against cruel and un- usual punishment. 543 U.S. 551, 125 S.Ct. 1183.

who is convicted of a homicide. In *Roper*, the Court responded to the argument that the possibility of the death penalty was necessary to deter minors from committing homicides by noting that the punishment of life without parole is a severe enough sanction to serve as deterrence. 543 U.S. at 572, 125 S.Ct. 1183. In *Graham*, the Court recognized that a line existed "between homicide and other serious violent offenses against the individual." 130 S.Ct. at 2027 (internal citations omitted). Defendants who commit nonhomicide offenses, therefore, are "categorically less deserving of the most serious forms of punishment than are murders." *Id.* Even defendants who commit crimes that cause serious bodily harm to another individual cannot be compared to murders with regard to the severity and irrevocability of their crimes. *Id.* By illustrating the differences between all other juvenile criminals and murderers, the Court implies that it remains perfectly legitimate for a juvenile to receive a sentence of life without parole for committing murder. 130 S.Ct. at 2027. The chief justice further notes that there is "nothing inherently unconstitutional about imposing sentences of life without parole on juvenile offenders." 130 S.Ct. at 2041 (Roberts, C.J., concurring).

In his reply brief, Andrews acknowledges that life without parole when imposed on a minor for a homicide is not unconstitutional. He then argues that Missouri's statutory scheme still violates the Eighth Amendment because it imposes mandatory life without parole without any discretion to impose any alternative sentence. Andrews relies on language from *Graham* that "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." 130 S.Ct. at 2031. However, the flaw in this argument is the fact that § 211.071.6(7) requires that the proceedings in the juvenile division of the circuit court consider "[t]he age of the child" in addition to other relevant factors. Therefore, Missouri's statutory scheme expressly considers the youthfulness of the child before he or she is exposed to the possibility of a mandatory life without parole sentence for first degree murder.[6] Andrews has failed to demonstrate that Missouri's imposition of mandatory life without parole on a juvenile for committing

---

**6.** The dissenting opinion does not cite to a single case decision in which a court has held that a mandatory life sentence without the possibility for parole for a juvenile homicide offender violates the Eighth Amendment's prohibition against cruel and unusual punishment. There are many cases prior to *Roper* and *Graham* that hold that a life without parole sentence for a juvenile homicide offender would not violate the Eighth Amendment. The following post-*Roper* cases hold that a life without the possibility of parole sentence for a juvenile homicide offender remains constitutionally permissible: *Miller v. State*, ── So.3d ────, 2010 WL 3377692, slip op. at 9 (Ala.Crim.App.) (holding "that Miller's sentence of life in prison without the possibility of parole—the second harshest sentence—for capital murder does not violate the Eighth Amendment"); *State v. Pierce*, 223 Ariz. 570, 225 P.3d 1146, 1147 (Ariz.App. 2010) (stating that in *Roper*, "[t]he [Supreme] Court expressly intimated that a natural life sentence for a juvenile who committed murder is not unconstitutionally cruel and unusual"); *State v. Allen*, 289 Conn. 550, 958 A.2d 1214, 1236 (2008) ("The courts are in consensus, however, that the United States Supreme Court clearly has signaled that [a life without parole] sentence [for a juvenile offender] does not violate the [E]ighth [A]mendment."); *Wallace v. State*, 956 A.2d 630, 641 (Del.Supr.Ct. 2008) (concluding that "the United States Supreme Court, in *Roper*, would not have recognized a sentence of life without parole as an acceptable alternative to death as a punishment for juveniles who commit intentional Murder in the First Degree, if such a sentence would violate the Eighth Amendment. Accordingly, we hold that Wallace's argument to the contrary without merit.").

first degree murder clearly and undoubtedly violates the Eighth Amendment of the constitution.

## Point II: Sufficiency of the Evidence

Andrews claims that the trial court erred in denying his motion for judgment of acquittal at the close of all evidence because the State failed to prove beyond a reasonable doubt that Andrews committed first degree murder.

### Standard of Review

In reviewing a challenge to the sufficiency of evidence, this Court must consider "the facts in evidence and all reasonable inferences that can be drawn therefrom" in the light most favorable to the verdict and must disregard "all contrary evidences and inferences." *State v. Goddard,* 649 S.W.2d 882, 884 (Mo. banc 1983).

### Analysis

■ Section 565.020.1 defines the crime of first degree murder as knowingly causing "the death of another person after deliberation upon the matter." Section 565.002(3), RSMo 2000, defines the intent element of "deliberation" as "cool reflection for any length of time no matter how brief." Andrews argues that in this case there was not sufficient evidence for the jury to find that he had time to think and intended for any period of time to kill the victim. *State v. Mitchell,* 408 S.W.2d 39, 43 (Mo. banc 1966). In this case, the jury heard and viewed a videotaped statement from Johnson in which Johnson stated that Andrews said that he was tired of being chased by the victim and pulled the .38 caliber handgun out of his pocket. Johnson further stated that Andrews then stopped running and waited for Officer Brown to arrive. This is more than a sufficient basis for the jury to have found that Andrews had at least a brief moment of cool reflection before killing Officer Brown.

## Point III: Environment of Impartiality

In his final argument Andrews asserts that the trial court erred in overruling Andrews' objection to the presence of uniformed officers, which he contends denied him an environment of impartiality for his jury trial.

### Standard of Review

■ A trial court has wide discretion in determining whether to take action to avoid an environment for trial in which there is not a "sense or appearance of neutrality." *State v. Baumruk,* 85 S.W.3d 644, 650 (Mo. banc 2002). Therefore, the trial court's ruling will only be disturbed if it is a clear abuse of discretion. *Id.* at 648.

### Analysis

■ "The environment of a trial must give jurors, who may otherwise have been carefully selected, a sense or appearance of neutrality." *Id.* at 649. Andrews argues that the trial court abused its discretion by allowing the presence of several uniformed officers to be present, which he claims created an atmosphere of undue pressure for the jury to convict Andrews. Andrews originally raised this issue through his motion in limine. The trial court denied that motion but told Andrews' counsel to bring anything that infringed on Andrews' constitutional rights during trial to its attention so it could be dealt with at that time. Andrews does not point to anything in the record where he further complained about the presence of uniformed officers. Nor does he point to anything where he made a record of the presence of any non-testifying and uniformed police officers or how the presence of any officers affected Andrews' right to a

fair trial. Therefore, this argument is un-preserved.

### Conclusion

In light of the foregoing, the judgment is affirmed.

PRICE, C.J., RUSSELL and BRECKENRIDGE, JJ., concur.

WOLFF, J., dissents in separate opinion filed; TEITELMAN and STITH, JJ., concur in opinion of WOLFF, J.; STITH, J., dissents in separate opinion filed; TEITELMAN and WOLFF, JJ., concur in opinion of STITH, J.

MICHAEL A. WOLFF, Judge, dissenting.

### Introduction

Antonio Andrews was convicted of first-degree murder, a crime he committed at age 15. He was sentenced to life in prison without the possibility of parole—the only sentence the law allows for a juvenile so convicted. The principal opinion holds that a sentence of life in prison without parole for a juvenile offender does not violate the Eighth Amendment's prohibition of cruel and unusual punishment.

The Supreme Court of the United States in *Roper v. Simmons* has held that sentencing a young person to death because of a crime he committed as a juvenile violates the constitutional prohibition against cruel and unusual punishment. 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) Young Christopher Simmons, convicted in *Roper* of a murder he committed at age 17, was sent to prison to be put to death. In this case, young Andrews also has been sent to prison to die, albeit of whatever natural causes might take him.

The question in this case, then, is whether the state violates the constitution by sentencing a young man to die in prison for a homicide he committed as a 15–year-old juvenile.

The Eighth Amendment's prohibition against cruel and unusual punishment bars inflicting punishments that are disproportionate to the capacity of the offender to be held accountable. The difference in mental development between a child and an adult—specifically, the child's still developing ability to make reasoned decisions—is a major premise of the United States Supreme Court's decisions in *Roper* and in *Graham*, which held unconstitutional a sentence of life in prison without parole for a juvenile in a nonhomicide case. *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

Life in prison *without* parole means Andrews is "an irretrievably depraved character,"[1] irrespective of any later maturation of his capacity to make decisions and to live a productive life. Life in prison *with the possibility* of parole nevertheless would mean Andrews will spend many years in prison before being eligible for parole and may spend the rest of his life in prison if the parole board does not determine that he is suitable for parole release under supervision in the community. A sentence of life with parole nonetheless would offer the possibility of redemption if the parole board determines, at some future date, that he is fit to be released on parole.

An increasing body of scientific knowledge confirms that juveniles are less capable—and therefore less culpable—than

---

1. A phrase used in *Roper*, 543 U.S. at 570, 125 S.Ct. 1183, and *Graham*, 130 S.Ct. at 2026.

adults. Andrews' case logically is indistinguishable from *Roper* and *Graham*. His sentence of life in prison without possibility of parole should be vacated, based on the Eighth Amendment's prohibition against cruel and unusual punishments, and his case remanded for re-sentencing to life with the possibility of parole.

### The "Cruel and Unusual" Standard

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. XIII. The Eighth Amendment has been incorporated to the states through the Fourteenth Amendment. *Roper*, 543 U.S. at 561, 125 S.Ct. 1183 (citations omitted); U.S. Const. amend. XIV. Embedded within the Eighth Amendment is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). What is permissive under the Eighth Amendment varies depending on the age of the defendant. *See, e.g., Roper*, 543 U.S. at 553–54, 125 S.Ct. 1183 (considering the characteristics of juveniles in holding that imposing the death penalty on juveniles is unconstitutional); *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (considering juveniles' characteristics in holding that imposing the death penalty on children 16 and younger is unconstitutional).

To determine what is "cruel and unusual," courts must look to "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). The standard of "cruel and unusual" is necessarily an evolving standard because it embodies a moral judgment. *Graham*, 130 S.Ct. at 2011; *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525 (2008). The standard itself remains the same, but its applicability must reflect the changes in moral understanding of society. *Graham*, 130 S.Ct. at 2011; *Kennedy*, 128 S.Ct. at 2649 (2008).

### The *Graham* and *Roper* Cases

Following *Roper*, *Graham* held that a sentence of life without possibility of parole for a juvenile in a nonhomicide case violated the Eighth Amendment's prohibition against cruel and unusual punishment because it violates society's "evolving standards of decency."[2] To determine the extent to which society's standards of decency have evolved, three factors are to be considered. First, courts consider "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against a particular type of sentencing. *Graham*, 130 S.Ct. at 2022 (quoting *Roper*, 543 U.S. at 572, 125 S.Ct. 1183). Next, courts look at the culpability of offenders in light of their crimes and the characteristics of the offenders—including scientific facts that bear on culpability—along with the severity of punishment. *Graham*, 130 S.Ct. at 2026. Finally, the last step is to assess the effectiveness of the sentence in achieving four penological goals—retribution, de-

---

**2.** In *Graham*, the petitioner was 16 when he committed armed burglary and attempted armed robbery. *Id.* at 2019. Graham pleaded guilty to burglary and attempted armed robbery 34 days before his 18th birthday and was sentenced to life in prison for armed burglary and 15 years for attempted armed robbery. *Id.* at 2019–20. Because Florida abolished its parole system, a life sentence gives a defendant no possibility of parole. *Id.* at 2020. Graham challenged the imposition of life without the possibility of parole for a nonhomicide offense. *Graham*, 130 S.Ct. at 2020.

terrence, incapacitation and rehabilitation. *Id.* at 2027–30.

The Supreme Court in *Graham* first considered "objective indicia of society's standards, as expressed in legislative enactments and state practice," to determine whether there is a national consensus against a particular type of sentencing. *Id.* at 2022 (quoting *Roper,* 543 U.S. at 572, 125 S.Ct. 1183). Looking at sentencing practice, the Supreme Court held that, given the rarity of imposition of life without parole for nonhomicide offenses, there was a national consensus showing that standards of decency had evolved to prohibit life without parole for nonhomicide offenses. *Graham,* 130 S.Ct. at 2023–26.

The Supreme Court then assessed the culpability of offenders—looking at the severity of their crimes and characteristics of the offender. *Id.* at 2026. Considering the characteristics of juveniles, the Supreme Court held that juveniles, as a class, were less culpable than other offenders. *Id.* at 2027. The Supreme Court, among other things, looked at the offense and determined nonhomicide offenses were less blameworthy than homicide. *Id.* Finally, the Supreme Court held that severity of punishment was extreme. *Id.* at 2027–28.

*Graham* is important for both reaffirming the considerations for determining whether a sentence violates the Eighth Amendment as well as illustrating the Supreme Court's heavy reliance on the unique characteristics of juveniles in determining what juvenile sentences are permissible.

*Graham* also is important for what it does not say. *Graham* does *not* hold that a sentence of life without parole for a homicide is constitutional. The Supreme Court distinguished juvenile life without parole for homicide and nonhomicide cases in many parts of its analysis.[3] The sentence at issue in *Graham,* however, was life without parole for the commission of a nonhomicide crime; therefore, the Supreme Court could not have held that life without parole was permissible for homicide because so holding would have been an advisory opinion in violation of the constitution.[4]

The principal opinion interprets *Graham* to hold that life without parole is permissible for homicides. This is incorrect for two reasons. First, the principal opinion cites Chief Justice Roberts' lone concurring opinion, which is *not* binding precedent. The portion quoted, when examined in its entirety, merely sets forth Roberts' objection to any categorical ban on life without parole for both homicide and nonhomicide offenses—in contrast to the Supreme Court's majority opinion that imposed a categorical ban. *See Graham,* 130 S.Ct. at 2041 (Roberts, C.J., concurring).[5] While *Graham* is useful in determining

---

3. For example, the Supreme Court in *Graham,* in *dicta,* alluded to the possibility that life without parole may further a legitimate goal by saying: "But while incapacitation *may* be a legitimate penological goal sufficient to justify life without parole in other contexts, it is inadequate to justify that punishment for juveniles who did not commit homicide." *Id.* at 2040 (emphasis added). The Supreme Court, however, neither specified that life without parole may be a legitimate goal in sentencing *juveniles* nor specified the context in which it would be acceptable.

4. U.S. Const. art. III, sec. 1; *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (*per curiam* ).

5. Chief Justice Roberts in his concurring opinion said: "A more restrained approach is especially appropriate in light of the Court's apparent recognition that it is perfectly legitimate for a juvenile to receive a sentence of life without parole for committing murder." *See Graham,* 130 S.Ct. at 2041 (Roberts, C.J., concurring).

how a juvenile's unique characteristics interact with Eighth Amendment analysis, *Graham* does not dictate the outcome in this case.

The principal opinion also interprets *Roper* as expressly recognizing that sentences of life without parole are constitutional for juveniles. The Supreme Court in *Roper* held that sentencing a juvenile to death was cruel and unusual punishment. *See Roper*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). When discussing the inapplicability of deterrence as a legitimate penological goal, the Supreme Court said, "To the extent that the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." *Id.* at 572, 125 S.Ct. 1183. Again, the Supreme Court was not holding that the deterrent effect of life without parole was sufficient justification for its imposition; instead, the Supreme Court merely was using life without parole as an example of alternative punishment. The offender in *Roper* was not challenging a sentence of life without parole; he simply was trying not to be put to death. The fact that the Supreme Court did not intend to hold life without parole constitutional in *Roper* is recognized by its holding in *Graham* that life without parole is unconstitutional for nonhomicide of-fenses. The principles expressed in *Roper* and *Graham* are helpful in this case; they do not foreclose the relief Andrews seeks here.[6]

### Life Without Parole is Cruel and Unusual Punishment

Sentencing juvenile offenders to life without the possibility of parole is cruel and unusual punishment because society's standards have evolved to prohibit it.

While *Graham* and *Roper* examined legislation and statistics about the commonality of such sentences, these are incomplete indicators of the broader question of whether society's standards have evolved, but they are helpful. *See Graham*, 130 S.Ct. at 2022; *Roper*, 543 U.S. at 572, 125 S.Ct. 1183. There are about 2,600 offenders currently serving life without parole for homicides committed while they were juveniles.[7] Seven states and the District of Columbia prohibit life without parole for juveniles, four states allow life without parole but do not impose it, and 40 states and the federal system actively sentence juveniles to life without parole.[8] Legislation does not seem to be indicative of a national consensus against life without parole for juveniles. The absence of legislation prohibiting a particular type of sentence, however, is not conclusive as to contemporary standards of decency. *See Graham*, 130

---

6. The application of *Roper* and *Graham* to juvenile life without parole sentences is rare, due perhaps to how recently *Graham* was decided. *Graham*, 130 S.Ct. at 2022; *Roper*, 543 U.S. at 572, 125 S.Ct. 1183. Similarly recent is the question of applying *Apprendi* to the process of certifying a juvenile to stand trial as an adult and be subject to a life sentence without parole. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). I agree with the cogent analysis of this issue in Judge Stith's separate opinion about the *Apprendi* issue in this case. *See State v. Rudy B.*, 149 N.M. 22, 243 P.3d 726 (Chávez, J., dissenting).

7. Human Rights Watch, *State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP)* (October 2, 2009), *available at* www.hrw.org/en/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole.htm.

8. Michelle Leighton & Connie de la Vega, *Sentencing Our Children to Die in Prison: Global Law and Practice*, U.S.F.L. Rev. 983, 1002 (2008).

S.Ct. at 2022 (looking part legislation to actual sentencing practices); *Roper*, 543 U.S. at 572, 125 S.Ct. 1183 (looking past legislation to actual sentencing practices).

Actual sentencing practices also can show evolving standards. Here, the statistics are inconclusive because of the lack of discretion in many states' sentencing laws. Sixteen states have a mandatory juvenile sentencing statute (meaning that if a juvenile commits certain crimes, he or she must serve a mandatory sentence of life without parole), and 25 states have discretionary life without parole sentences (meaning that the sentence is authorized by statute but courts have discretion regarding if and when they sentence a juvenile to life without parole). Because courts have been mandated by statute to impose life without parole in the majority of states where such a sentence is permitted, it is impossible to determine whether sentencing practices show that standards have evolved because, in practice, many courts have no discretion in this area of sentencing.[9]

The average number of juveniles sentenced to life without parole, however, is significantly higher in states that mandate sentences of life without parole than states that allow courts to exercise discretion. The average number of juveniles sentenced to life without parole in states having mandatory such sentences is 82.36. This is significantly higher than the average number of juveniles sentenced to life without parole in states in which sentencing courts have discretion—13.19. These statistics, which are raw numbers and not percentages of those sentenced, illustrate that an evolving standard may be occur-

ring but that mandatory sentencing schemes prevent effective analysis.[10]

Society recognizes that juveniles are different, even without the specific statistics about sentencing. Missouri, for example, has enacted numerous laws that limit the privileges of a minor. *See, e.g.*, section 115.133 (setting the minimum voting age at 18); section 302.060 (must be 16 to obtain a driving license); section 311.325 (setting the minimum drinking age at 21);[11] section 431.056 (regarding minors' capacity to enter into contracts); section 431.061 (must be 18 to consent to surgical or medical treatment); section 451.090 (must be 18 to enter into a marriage contract without parental consent); section 474.310 (must be 18 to make a will); and section 494.425 (must be 21 to serve on a jury). This legislation shows that society recognizes that, in a variety of situations, juveniles should be—and are—treated differently from adults.

### The Role of Scientific Understanding

Without state legislation establishing clear guideposts, courts turn to a different barometer of social decency—scientific understanding. *Roper* and *Graham* show that the Supreme Court's view and society's view of juvenile offenders are influenced highly by scientific facts—namely that, due to juveniles' innate biological differences, they must not be held to the same punitive standard as adults. *See also Thompson*, 487 U.S. at 815–16, 108 S.Ct. 2687.

Brain imaging studies have shown that the frontal lobes of the brain, which are not developed until late adolescence, have

---

**9.** *See State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP)*, (October 2, 2009), *available at* www.hrw.org/en/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole.htm.

**10.** *Id.*

**11.** All citations are to RSMo 2000 unless otherwise stated.

an impact on response inhibition, regulation of emotion, planning and organization.[12] *Roper* and *Graham* acknowledge that modern science now has established as fact the differences in juvenile brains and the effects of those differences on behavior and culpability. For instance, in *Roper*, the majority cites Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist, November 2009, at 1009, 1014; *Roper v. Simmons*, 543 U.S. at 569, 125 S.Ct. 1183. Laurence Steinberg, one of the authors cited in *Roper*, has a more recent review of the science in the November 2009 issue of the same journal. Lawrence Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?* 64 AM. PSYCHOLOGIST, November 2009, at 742–43. Steinberg notes four specific noteworthy changes in the brain during adolescence:

First, there is a decrease in gray matter in the prefrontal regions of the brain during adolescence—most likely due to the elimination of unused neuronal connections. This biological change results in major improvements in information processing and logical reasoning as the adolescent matures. *Id.* at 742.

Second, there is a significant change in activity of the neurotransmitter dopamine. Shifts in the proliferation and redistribution of dopamine receptors are believed to affect adolescent's weighing of costs and rewards of behavior. *Id.* at 743.

Third, there is an increase during adolescence of white matter in the prefrontal regions. This increased white matter affects the adolescent's response inhibition, long-term planning, weighing of risks and benefits, and the simultaneous consideration of multiple sources of information. *Id.*

Finally, as the child ages, there is an increase in connections between the cortical and subcortical regions, a change that is important for regulation of emotion. *Id.*

A very recent review of the relevant brain science notes "an explosion of studies examining the neurobiology of adolescence." Leah H. Somerville & B.J. Casey, *Developmental neurobiology of cognitive control and motivational systems*, 20 Current Op. in Neurobiology, September 2010, at 236–241. The studies, the authors observe, have focused on "evaluating the hypothesis that during adolescence, unique patterns of brain activity arise that predict stereotypical aspects of adolescent behavior including risk-taking and sub-optimal decision-making in the face of incentives." *Id.* According to recent studies, the authors report, "adolescents show a unique sensitivity to motivational cues that challenges the less mature cognitive control system, resulting in an imbalance between these systems and ultimately *patterns of behavior that are unique to adolescents.*" *Id.* (Emphasis added.)

---

12. Studies with functional magnetic resonance imaging (fMRI) show substantially less maturity in critical areas of the brain at age 15 when compared to adults. Nico U.F. Dosenbach et al., 329 *Prediction of Individual Brain Maturity Using fMRI*, Science (AAAS), September 2010, no. 5997 pp. 1358–1361. *See also*, J.N. Geidd et. al., *Quantitative magnetic resonance imaging of human brain development: Ages 4–18*, Cereb Cortex, July 1996, at 551–560; Elizabeth R. Sowell et al., *In vivo evidence for post-adolescent brain maturation in frontal and striatal regions*, 2 Nature Neuroscience, October 1999, at 859–61; Katerina Velanova, et al. *The Maturation of Task Set–Related Activation Supports Late Developmental Improvements in Inhibitory Control*, 29 Journal of Neuroscience, October 2009, at 12558–67.

Studies also show that preference for immediate rewards and sensation-seeking peak around ages 14 and 16 and then decline. Lawrence Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?* 64 AM. PSYCHOLOGIST, November 2009, at 745 (November 2009). Impulse control, anticipation of future consequences, strategic planning and resistance to peer influence all increase linearly from preadolescence through late adolescence. The compelling and simply stated result of this research? Juveniles are different. *Id.* at 746.

This current research confirms what the Supreme Court majority said in *Graham:*

No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles.... [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence.... Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults.

130 S.Ct. at 2026.[13] This Court must consider the culpability of the offenders as well as the severity of their punishment. *Roper* and *Graham,* in their essence, recognize that juveniles are less culpable than adults. *Graham,* 130 S.Ct. at 2026; *Roper,* 543 U.S. at 575, 125 S.Ct. 1183. The Supreme Court recognized:

As compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures,

including peer pressure"; and their characters are "not as well formed." These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offenders whose crime reflects irreparable corruption."

*Graham v. Florida,* 130 S.Ct. at 2026 (quoting *Roper,* 543 U.S. at 569–573, 125 S.Ct. 1183). Punishment, therefore, should reflect the ambiguity regarding motivation and culpability in the commission of a crime. A juvenile's culpability for the same crime is innately less than an adult's because "from a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a great possibility exists that a minor's character deficiencies will be reformed." *Roper,* 543 U.S. at 570, 125 S.Ct. 1183. This basic tenet holds true even when a juvenile commits the most heinous of crimes, homicide.

The severity of the punishment—life in prison without the possibility of parole—is the second most severe penalty of all and is the most severe that exists for juveniles. Although the state does not execute the juvenile, the sentence "alters the offender's life by a forfeiture that is irrevocable." *Graham,* 130 S.Ct. at 2027. A life without parole sentence is a "denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Graham,* 130 S.Ct. at 2027 (quoting *Naovarath v. State,* 105 Nev. 525, 526, 779 P.2d 944 (1989)).

13. The authorities the Supreme Court cites for these developments are briefs *amici curiae* filed on behalf of the American Medical Association and the American Psychological Association *et al.* Supporting Petitioners, *Graham,* 130 S.Ct. at 2026 (nos. 08–7412, 08–7612).

Life without parole in practicality is a death sentence. It is especially harsh for a juvenile offender, who will serve both a greater number of years as well as a greater percentage of his life in prison than an adult. *Graham*, 130 S.Ct. at 2027; *Roper*, 543 U.S. at 572, 125 S.Ct. 1183. The lessened culpability of a juvenile—when compared to the greater relative severity of the punishment—does not meet contemporary standards of decency.

## "Penological Goals"

The penological goals of retribution, deterrence, incapacitation and rehabilitation are also relevant to the analysis as "a sentence lacking any legitimate penological justification is by its nature disproportionate to the offense" and cruel and unusual. *Graham*, 130 S.Ct. at 2028. Here, retribution does not justify the imposition of life without parole. To be a legitimate sentencing goal, retribution must be "directly related to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). A juvenile's culpability, even for homicide, is substantially less than an adult's. *Roper*, 543 U.S. at 570, 125 S.Ct. 1183; Brief for American Psychological Association *et al.* as *Amici Curiae* Supporting Petitioners at 31; *Graham*, 130 S.Ct. at 2011 (Nos. 08–7412, 08–7612). Imposing the most severe non-death punishment on a juvenile is not proportional to a juvenile's culpability.

Likewise, deterrence is not sufficient to justify life without parole. Science establishes that juveniles have diminished capacity to evaluate the long-term consequences of their behavior as well as an increased tendency to engage in risk-taking behavior. *Graham*, 130 S.Ct. at 2028–29; Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?* at 246–41. This inability to consider the consequences of behavior illustrates the limited impact of punishment as a deterrent. Any limited deterrent effect provided by life without parole, therefore, is insufficient to justify it as a penological goal. *See Graham*, 130 S.Ct. at 2029; Brief for American Psychological Association *et al.* as *Amici Curiae* Supporting Petitioners at 32, *Graham*, 130 S.Ct. 2011.

Incapacitation also does not justify imposing life without parole sentences. For life without parole to be a legitimate goal, the juvenile offender must be incorrigible and, therefore, present a permanent danger to society. *Graham*, 130 S.Ct. at 2029. The transient characteristic of youth, however, shows not only that can juveniles change but also that the ability to change is an essential characteristic of juveniles. *Id.* A life without parole sentence denies the juvenile offender the opportunity to grow into the adult that he could be at any time during his natural life.[14]

A sentence of life without parole explicitly rejects the final theory of sentencing—rehabilitation. Offenders serving life without parole usually are denied access to vocational training and other rehabilitative services. *Graham*, 130 S.Ct. at 2030, citing briefs *Amici Curiae* of The Sentencing Project supporting Petitioners, *Florida v. Graham*, 130 S.Ct. 2011 (2010) (Nos. 08–7412; 08–7612) and J. Lawrence Aber *et*

---

14. The Missouri Constitution, however, does grant to the governor the power to commute a sentence or to pardon an offender. Mo. Const. art. IV, sec. 7. Given the history of governors' reluctance to use the constitutional power of clemency, especially in homicide cases, the executive's power of commutation is an unlikely source of hope for the juvenile offender sentenced to spend the rest of his life in prison.

*al.* supporting Petitioners, *Florida v. Graham*, 130 S.Ct. 2011 (2010) (Nos. 08–7412; 08–7612).[15] By sentencing a juvenile to life without parole, the juvenile is denied the chance to become rehabilitated and rejoin society.

Despite the heinousness of his crime, there may come a time when a future parole board could find that Andrews has matured fully, that he has been punished enough, that he is unlikely to be a danger to society and that he can function in society as a productive member. Under the current law, that is impossible; the parole board has no discretion. Such redemption is possible, however, if his sentence is reduced to a life sentence with the possibility of parole. Current law provides for a lengthy time in prison before a convicted murderer becomes eligible for parole, and he may yet spend the rest of his life in prison.[16] "The state is not required to guarantee eventual freedom," the Supreme Court said in *Graham*, referring to nonhomicide juvenile offenders and noting the lack of a meaningful opportunity to demonstrate "maturity and rehabilitation." 130 S.Ct. at 2030. But, in any case, it is cruel and unusual punishment to deny the juvenile offender the possibility that he might redeem himself.

## Age as a Mitigating Factor Under the Eighth Amendment

Another reason to find Missouri's sentencing scheme unconstitutional is its failure to consider age as a mitigating factor. If the jury were given the choice of whether to recommend a sentence of life with parole, in addition to the choice of life without parole, the sentencing law may be constitutional *only if* a jury were able to consider a defendant's age in making this determination. "An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham*, 130 S.Ct. at 2031.

In fact, Missouri law requires the jury to consider a defendant's age at the time of the crime as a statutory mitigating factor in determining whether to recommend a death sentence or instead a sentence of life imprisonment. Section 562.032.3(7). This requirement still applies to those over 18. But for those under 18, because death has been removed as a possible punishment, the statutory admonition has no meaning. In view of the stakes involved here— stakes that invoke the protections of the Eighth Amendment—age is no less relevant as a mitigating factor in determining whether that life sentence should be with

**15.** Discussing the lack of rehabilitation services for offenders serving life without parole leads me to the uncomfortable subject of race. Black juveniles are prosecuted more frequently as adults in criminal courts as well as sentenced to juvenile life without parole. Blacks sentenced as juveniles serve life without parole sentences at a rate that is 10 times higher than white children. Human Rights Watch, *State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP)* (October 2, 2009), *available at* www.hrw.org/en/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole.htm. State statistical data also show extreme disparity in life without parole sentences. *Id.* Missouri has a ratio of 7.9

black youths sentence to life without parole for every white youth and has the 16th highest black/white ratio in the country for such sentencing. Amnesty International, CLWOP: How Does Your State Measure Up? (last visited November 29, 2010), *available at* http://www.amnestyusa.org/us-human-rights/other/clwop-laws-in-your-state/page.do?id=1011341&st=MO&sid=25.

**16.** *See* section 558.016; *see also* Missouri Department of Corrections, Board of Probation and Parole, *Procedures Governing the Granting of Paroles and Conditional Releases* at 10 (April 2009) available at http://doc.mo.gov/documents/prob/Blue%20Book.pdf.

or without the possibility of parole than it was previously.

Now that Missouri law requires that the guilt and punishment phases of criminal trials be separated, section 557.036.2, defendants are entitled to introduce mitigating evidence (and the prosecution to put on victim impact evidence as aggravating factors) in all cases in which punishment is tried to a jury *except* one involving a person found guilty of first-degree murder committed while under the age of 18,[17] for in all such cases, more than one punishment is available and the relevance of such mitigating evidence is self-evident.

The evidence is even more relevant in the case of a youth, yet Missouri's mandatory life without parole sentencing scheme does not permit judge or jury to consider a juvenile offender's youth. Instead, Missouri laws demands the imposition of a life sentence without parole regardless of the characteristics of the offender. The imposition of a life sentence without parole—without consideration of Andrews' age—fails to ensure that Andrews' sentence is proportional to his crime. As such, the Missouri sentencing mandate is flawed and violates the Eighth Amendment.

The principal opinion rejects this analysis, arguing that Missouri's consideration of the defendant's youth in the juvenile certification hearing is sufficient. Section 211.071.6(7). The principal opinion goes to great length to explain why it believes that the certification decision is *not* part of the criminal trial and, therefore, that the jury is not required under *Apprendi*[18] to make the findings required by that statute, including the statute's requirement that the defendant's age be considered in determining certification.[19] If this certification is to satisfy *Graham*'s requirement that a child's youth be considered, then it must be considered by the jury. Additionally, the certification is only to determine whether the youth can be *tried as an adult*. It is not intended to—and does not require the court to—determine whether the child is sufficiently culpable and his or her cognitive processes are developed sufficiently that the child can be sentenced to life without parole. The latter is a separate question that may have a different answer, as *Roper* recognized in stating that a child may be certified to stand trial as an adult yet not be eligible for the death

---

**17.** When the punishment phase is heard by a judge rather than a jury, the judge will consider these mitigating factors. Section 557.036.4, RSMo Supp.2009.

**18.** *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**19.** As the principal opinion notes, section 211.071.6 requires the court to consider 10 factors in determining certification, including:
(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;
(2) Whether the offense alleged involved viciousness, force and violence;
(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;
(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;
(6) The sophistication and maturity of the child as determined by consideration of his home and environmental situations, emotional condition and pattern of living;
(7) The age of the child;
(8) The program and facilities available to the juvenile court in considering disposition;
(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and
(10) Racial disparity in certification.
Section 211.071.6.

penalty because of his or her youth. *Roper*, 543 U.S. at 578–79, 125 S.Ct. 1183.

Because the jury here was not permitted to consider defendant's youth or other mitigating factors in determining punishment, the constitution requires Andrews' case be remanded for a new penalty phase trial at which a sentence including parole may be considered. It is hoped that the General Assembly will act to set out parameters for this "penalty phase" hearing and to dictate what considerations the jury ought to assess at that hearing, including the defendant's youth. *Graham*, 130 S.Ct. at 2031–2032. In the interim, however, juries have long been thought capable of considering mitigating factors and determining punishment in all cases other than those involving first-degree murder by a juvenile, and they should similarly be permitted to do so in this and other similar cases.[20]

## Conclusion

Life in prison with no possibility for parole for a juvenile may be worse than the death penalty. It may seem quaint to note here the original purpose of the "penitentiary"—to permit the prisoner to do penance for his crime, to examine his conscience and to repent for his past criminal life. There surely are many cases in which the juvenile offender has done just that;

nevertheless, he still will have to spend the remainder of his life behind bars.

Society's treatment of children in the criminal justice system reflects an evolving standard of decency, a standard that science reinforces. Juveniles, whether sentenced for homicide or other offenses, are significantly less culpable than adults. Sentencing a juvenile offender to spend his life in prison without the possibility of parole is cruel and unusual punishment and violates the Eighth Amendment.

Juveniles should not be sentenced to die in prison any more than they should be sent to prison to be executed. Certainly, should they be so sentenced, it should be because of an individual finding of sufficient culpability, not because Missouri law categorically requires a judge or jury to disregard the defendant's youth and other mitigating factors to which older offenders are entitled consideration in determining punishment.

I respectfully dissent.

LAURA DENVIR STITH, Judge, dissenting.

I concur fully in the dissenting opinion of Judge Wolff. I write separately to address two related issues.

---

**20.** This lack of legislative guidance compounds the problem, which the Supreme Court noted in *Graham*, that courts and juries could not "with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." *Id.* The American Bar Association has noted that the decision as to the "appropriateness—or inappropriateness—of parole for juvenile offenders [should not be made by courts and juries, but] should be made at reasonable points in their sentences, based on the adults they have become." Brief for American Bar Association as *Amicus Curiae* Supporting Petitioners at 19, *Graham*, 130

S.Ct. 2011 (nos. 08–7412, 08–7621). Otherwise:

> [a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death.

*Id. See also* Brief for Council of Juvenile Correctional Administrators *et al.* as *Amici Curiae*, supporting Petitioners, *Graham*, 130 S.Ct. at 2011 (nos. 08–7412, 08–7621).

### A. The Jury Must be Able to Consider Culpability in Choosing Punishment.

First, I wish to emphasize that to preclude the jury from considering mitigating facts, including defendant's age, is to prevent the jury from making the kind of individualized assessment of a juvenile's culpability that the United States Supreme Court recognized in *Graham v. Florida* as essential to the constitutionality of sentencing a juvenile to life imprisonment. —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

Indeed, permitting the jury (or judge) to hear mitigating evidence and to consider that evidence in deciding the severity of punishment that should be imposed is the practice in nearly every other circumstance, whether the defendant is a juvenile or an adult. In regard to all such crimes, the fact-finder is permitted to choose among sentences of different severity. Only juveniles tried as adults for first-degree murder are deprived of the fact-finder's consideration as to whether mitigating factors affect the defendant's culpability.

This is a violation of the Eighth Amendment for, as the United States Supreme Court stated in *Graham*, "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." 130 S.Ct. at 2031. It is also inconsistent with the principles underlying Missouri's legislative admonition that the jury must be instructed to consider a defendant's age at the time of the crime as a statutory mitigating factor in determining whether to recommend a death sentence or, instead, a sentence of life imprisonment. § 562.032.3(7). While this provision no longer is constitutional as applied to homicides committed by a juvenile, in that a sentence of death is not permitted under *Roper*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the principle it reflects—that a defendant's age may affect the defendant's culpability and mitigate the punishment for his or her crime—has continued life and should require consideration of a defendant's age and culpability in sentencing for a crime committed as a juvenile.

### B. Apprendi Requires a Jury to Determine Facts Necessary for Eligibility for a Life Sentence rather than Treatment as a Juvenile.

Second, Missouri already recognizes that consideration of a juvenile's age is required to make the juvenile eligible for imposition of a sentence of life without parole, for Missouri requires the judge to consider the juvenile's culpability and age when deciding to certify the juvenile as an adult.

That is what happened here. When Antonio was arrested, he was subject to proceedings in the juvenile division of the circuit court under chapter 211, RSMo. The juvenile officer made a motion to dismiss the juvenile proceeding so that Antonio could be charged and tried as an adult. To dismiss the juvenile proceeding, the judge held a hearing to determine whether a juvenile proceeding was appropriate for him or whether the juvenile proceeding should be dismissed. To do so, the judge had to make certain findings of fact and conclusions of law.[1]

As a result of the dismissal of the juvenile proceedings, Antonio was "certified" to stand trial as an adult and became subject to the punishment an adult would receive for this crime, absent the death penalty—life without probation or parole.

---

1. The applicable statutory criteria are listed in their entirety in footnote 4.

A plurality of the United States Supreme Court reasoned in *McKeiver v. Pennsylvania* that there is no right to a jury trial within a state's juvenile system because it would inject "the clamor of the adversary system" where it does not belong and put an end to "the idealistic prospect of an intimate, informal protective proceeding." 403 U.S. 528, 550, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).[2] It is appropriate that the factual determinations required for certification be made by the judge in the juvenile proceeding in the first instance before the defendant is to be deprived of the protections of that system. But there also is no question that these factual determinations greatly enhanced the punishment to which Antonio could be subjected.

These facts apply directly here. In many cases, Missouri's juvenile system does allow for "an intimate, informal protective proceeding" to occur. But in the case of a 15–year–old male charged with first-degree murder for shooting a police officer—in the case of Antonio, in other words—the certification process undoubtedly is not such a process. It is the same adversarial process that will be used after the juvenile proceeding is dismissed and the child is prosecuted as an adult. In this case, and undoubtedly in most such cases where a juvenile is charged with a serious violent felony, the prosecutor wanted the juvenile to be punished for longer than six years. The state may do so, but *only* in a manner that preserves the right to a jury trial on the facts that can result in his punishment or would enhance his punishment.

The right to a jury is guaranteed to all adults in "serious" criminal cases by both the United States and Missouri constitutions. It is a fundamental right, premised on the jury's traditional function of finding the essential facts necessary to impose a punishment. U.S. CONST. AMENDS. VI & XIV; MO. CONST., art. 1, secs. 18(a) and 22(a); *see also Duncan v. Louisiana*, 391 U.S. 145, 157–58, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Blakely v. Washington*, 542 U.S. 296, 309, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *State v. Baxter*, 204 S.W.3d 650, 652–53 (Mo. banc 2006).

For this reason, the United States Supreme Court has held repeatedly that it " 'is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *quoting Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (Stevens, J., concurring). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

Applying these principles, *Apprendi* found that it violated the Sixth Amendment right to jury trial for a judge, rather than the jury, to make the factual findings that allowed the judge to sentence the defendant to a 12–year term, because without the trial judge's finding, the defendant could have received no more than a 10–

---

**2.** The concurring opinion in *McKeiver* further notes that the purpose of the juvenile system is to focus on rehabilitating the juvenile and that the creation of the juvenile system reflects "state legislative judgment not to stigmatize the juvenile delinquent by branding

him a criminal." *Id.* at 552, 91 S.Ct. 1976 (White, J., concurring). Justice White also noted that the juvenile system serves as a "buffer to the corrupt or overzealous prosecutor." *Id.*

year–term. 530 U.S. at 471, 476–97, 120 S.Ct. 2348.

The Supreme Court has extended *Apprendi*'s rationale several times. *Blakely* held that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without any additional findings*." *Blakely,* 542 U.S. at 303–04, 124 S.Ct. 2531 (emphasis added). The defendant in *Blakely* pleaded guilty to second-degree kidnapping involving the use of a firearm. *Id.* at 299, 124 S.Ct. 2531. He did not plead guilty to any additional facts. Washington's sentencing reform act specified that the "standard range" of punishment the defendant should receive for his crime was 49 to 53 months in prison but allowed the trial judge to impose a sentence up to 120 months if he found "'substantial and compelling reasons justifying an exceptional sentence.'" *Id., quoting* Wash. Rev.Code Ann. § 9.94A.120 (2000). The judge eventually issued 32 findings of fact, concluded that the defendant had acted with "deliberate cruelty" and sentenced him to 90 months in prison. *Id.* at 300–01, 124 S.Ct. 2531.

Even though this sentence was lower than the maximum 120–month sentence allowed under Washington law, *Blakely* found that the trial judge's sentence was "beyond the prescribed statutory maximum" because the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Id.* at 303, 124 S.Ct. 2531 (emphasis in original).[3]

More recently, the United States Supreme Court invalidated California's determinate sentencing law, which allowed trial courts to impose longer or shorter prison sentences than the "middle term" of sentences if the court found circumstances in aggravation or mitigation. *Cunningham v. California,* 549 U.S. 270, 277, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) (internal citations omitted). The Court reasoned that if "the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." *Id.* at 290, 127 S.Ct. 856.

The principal opinion says these principles have no application here because Missouri's certification procedure does not involve any findings of fact that change the statutory maximum that a defendant such as Antonio can receive, but, instead, the findings in a certification proceeding merely serve to transfer "jurisdiction" from the juvenile court to a court of general jurisdiction, although both juvenile and adult crimes are prosecuted in different divisions of the same court, the circuit court. Mo. CONST. art. V, § 14.

The principal opinion's holding that a judge's decision on certification is merely a decision as to which court has jurisdiction over the defendant dramatically oversimplifies what is occurring. In fact, the principal opinion later so argues, slip op. at 14–15, if consideration of a defendant's culpability is required, the judge satisfies that requirement in the certification process. The principal opinion, therefore, seeks to have it both ways. But if the certification

---

**3.** The Supreme Court has held that all aggravating circumstances in a death penalty case must be decided by a jury and not a judge. *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Court reasoned that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact-finding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death." *Id.* at 609, 122 S.Ct. 2428.

is intended to substitute for jury consideration of culpability, then it violates *Apprendi* and, if not, then there is no consideration of these factors in determining guilt and punishment, violating *Graham.*

Although certification occurs before rather than after the jury trial, by creating a certification procedure for juveniles under the age of 17 years, the Missouri legislature required that additional facts be found regarding these juveniles and their alleged offenses. The statute shows a clear legislative recognition that juveniles are different and that a decision as to the length of their punishment should include a determination of certain criteria. *See* § 211.071.6, RSMo 2000.[4]

*Apprendi* mandates that "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" 530 U.S. at 494, 120 S.Ct. 2348. Under Missouri's certification proceeding, a defendant under the age of 17 years either receives a "sentence" that lasts, at most, until he or she turns 21 years old or receives a sentence that potentially extends for his or her entire life. § 211.071, RSMo Supp.2009.

The latter is what happened here. A judge in the juvenile division of the circuit court held that Antonio should be certified as an adult—and subjected to a life sentence without parole. In so doing, he made the following findings of fact as to issues set out in the certification statute: the crime alleged involved "viciousness, force and violence;" Antonio had a "repetitive pattern of offenses;" he was "both sophisticated and streetwise" and tested positive for marijuana when he was arrested; he had no "extreme emotional problems" or "diagnosed learning disability;" he had a good relationship with both parents; insufficient time existed to rehabilitate Antonio in the juvenile justice system because the division of youth services is not required to retain juveniles after they reach the age of 18, and, in the court's experience, the division was not likely to request extension of its jurisdiction past the age of 18; the juvenile justice system had no suitable programs and facilities for Antonio; and he was beyond rehabilitation under the juvenile code.

4.  Section 211.071.6, RSMo 2000 provides:

    A written report shall be prepared in accordance with this chapter developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper subject to be dealt with under the provisions of this chapter and whether there are reasonable prospects of rehabilitation within the juvenile justice system. These criteria shall include but not be limited to:
    (1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;
    (2) Whether the offense alleged involved viciousness, force and violence;
    (3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

    (4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;
    (5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;
    (6) The sophistication and maturity of the child as determined by consideration of his home and environmental situation, emotional condition and pattern of living;
    (7) The age of the child;
    (8) The program and facilities available to the juvenile court in considering disposition;
    (9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and
    (10) Racial disparity in certification.

Antonio was 15 years old when he killed Norvelle Brown. These *multiple* findings of fact increased the possible sentence he could receive from a mere six years to an entire lifetime in prison.

The principal opinion argues further that *Apprendi* does not prevent a court from exercising its discretion in imposing a judgment within the statutory range because the punishment for first degree murder is life without parole. As the United States Supreme Court has made clear in *Blakely*, the relevant statutory maximum is not the height of the statutory range provided for by the legislature but rather the maximum sentence a judge may impose on a particular defendant *based on facts that are found by a jury*. 542 U.S. at 303–04, 124 S.Ct. 2531.

*Oregon v. Ice*, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009), cited by the principal opinion, does not impinge on this analysis; it requires an inquiry as to "whether the finding of a particular fact was understood as within 'the domain of the jury ... by those who framed the Bill of Rights.'" 129 S.Ct. at 717, *quoting Harris v. United States*, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion) (deletion in original). Nonetheless, *Ice* itself reasons that the *Apprendi* line of decisions are focused on any judicial fact-finding that increases "the maximum punishment authorized for a statutory offense." 129 S.Ct. at 714. *Ice* further notes that these decisions have not been extended "beyond the offense-specific context that supplied the historic grounding for the decisions." *Id.*

But, unlike the consecutive/concurrent sentencing issue in *Ice*,[5] the decision in this case—whether a juvenile's sentence such as Antonio's will be for six years or for his life—is an "offense-specific" decision. The certification procedure allows a trial judge to consider any criteria the judge sees fit, including the "seriousness of the offense alleged," "[w]hether the offense alleged involved viciousness, force and violence," and "[w]hether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted." § 211.071.6.

Moreover, at common law, juveniles were treated the same as adults, so it is impossible for the framers of the Bill of Rights to have taken into account special fact-finding procedures for juveniles, such as certification. *See In re Gault*, 387 U.S. 1, 14, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (noting that the juvenile court movement began in 1889 in Illinois and since had been adopted by every state, the District of Columbia and Puerto Rico). What is clear from the *Apprendi* line of cases is that the common law required that any fact necessary for imposing punishment must be found by a jury. As juveniles were treated the same as adults at common law, all facts necessary for their punishment, therefore, were required to be found by a jury. *See State v. Rudy B.*, 149 N.M. 22, 243 P.3d 726 (2010) (Chavez, J., dissenting).

When a court decides that a juvenile is to be tried as an adult, *Apprendi* requires that the Sixth Amendment command of a jury trial be obeyed. The jury's verdict alone in this prosecution is insufficient to

---

5. In *Ice*, the Supreme Court upheld an Oregon statute that allowed a trial judge to impose consecutive sentences on an offender when the judge found "statutorily prescribed facts," such as that the offender had a " 'willingness to commit more than one ... offense' during each criminal episode, and his conduct 'caused or created a risk of causing greater, qualitatively different loss, injury, or harm to the victim.'" 129 S.Ct. at 715–16 (citations omitted).

punish a 15–year–old defendant such as Antonio with a lifetime in prison. To prosecute Antonio as an adult, and to impose a sentence of life without parole, the additional fact-finding mandated by Missouri's juvenile certification process also is necessary. To allow this additional fact-finding to be made by a judge and not by a jury violates the defendant's fundamental right to a jury under the Sixth Amendment of the United States Constitution.[6]

I do not mean to suggest that the state is required to hold a separate jury proceeding for certification. The state undoubtedly has an interest in obtaining the certification decision expeditiously, as it did in this case, and to conduct proceedings in the juvenile division of the circuit court without a jury. But the judge's fact-finding should not be the final word in the prosecution of Antonio as an adult. If the judge finds sufficient facts to certify the defendant as it did in this case, the state should be required to present those certification facts to the jury and have the jury decide those facts before it determines whether Antonio is guilty of this adult offense of murder.

I respectfully dissent.

---

**6.** *See Cunningham,* 549 U.S. at 290, 127 S.Ct. 856 ("If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied"); *Apprendi,* 530 U.S. at 477, 120 S.Ct. 2348 (noting that historically "trial by jury has been understood to require that 'the truth of every accusation,* whether preferred in the shape of indictment, the information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours …' ") (*quoting* 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769)) (emphasis and changes in original).